[Crim. No. 14408.    Second Dist., Div. Three.    May 23, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES PATRICK WRIGHT, Defendant and Appellant.

Gilbert C. Caton, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Barry H. Lawrence, Deputy Attorney General, for Plaintiff and Respondent.

COBEY, J.—This appeal raises two principal questions. The first is whether a narcotics officer, without giving the warnings and obtaining the waiver required by *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], may interrogate a tenant of an apartment regarding his use of narcotics and whether any narcotics are then in the apartment at a time when he has probable cause to arrest him for a narcotics violation. We answer this question in the negative. The second question is whether such *Miranda* error requires reversal under *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], when it is followed by a lawful search of the apartment incident to the immediately subsequent arrest of appellant upon probable cause, *Miranda* warnings to and the requisite waiver by appellant, his subsequent station house confession very shortly thereafter, and finally, his taking the stand in an effort to exculpate himself. We reluctantly answer this question in the affirmative.

We discuss and decide the admissibility of the contraband, appellant's second or station house confession and his testimony for guidance of the lower court on the retrial of this case.

## The Appeal Lies

This is an appeal taken in 1967, from an order denying James Patrick Wright, the appellant, a new trial. The order followed a jury trial in which appellant was convicted of violation of Health and Safety Code section 11500—the illegal possession of heroin. Following this order criminal proceedings were adjourned without a final judgment and the initiation of narcotics addiction proceedings pursuant to Welfare and Institutions Code, section 3051, was ordered. Under these circumstances the order denying appellant a new trial was then appealable. (See *People* v. *Sweeting,* 256 Cal.App.2d 636, 637 [64 Cal.Rptr. 401].)

## The Facts

On April 10, 12, and 13, 1967, between approximately 6:45 and 10:15 a.m., appellant's wife made seven telephone calls from the apartment and in the hearing of one William Scofield. During these calls she spoke to a "Bobby" or a "Jack" and asked for a nickel's worth or $5 worth of "stuff" to relieve the sickness of herself and her husband. At the time Mrs. Wright made these calls her eyes were very bloodshot and watery and she was unable to sit still. Scofield, who lived in the same apartment house as the Wrights and who was an off-duty deputy sheriff, made detailed written notes of Mrs. Wright's portion of these conversations and then informed Deputy Sheriff Rodriguez of the Narcotics Detail of their substance. Rodriguez relayed this information to his partner, Eldon Burkett, a trained and experienced narcotics officer.

Shortly before 4 p.m. on April 21, 1967, Burkett and Rodriguez came to the apartment house where both Scofield and the Wrights lived. After rechecking with Scofield the information about the Wrights he had given them, the two officers proceeded directly to the Wrights' apartment where they were admitted by Mrs. Wright after they had identified themselves. Rodriguez inquired of the Wrights, who were in the living room, whether there was anyone else in the apartment. Appellant replied "Bobby" and pointed toward the bathroom. Rodriguez went over to the bathroom and requested

whomever was inside to come out. Robert Valdez came out.

Rodriguez and Valdez then talked together while Burkett talked to appellant. Burkett told appellant that he had information of possible narcotics use on the premises and asked appellant if this were so. Appellant replied in the affirmative. Burkett then asked appellant if he used narcotics and appellant again replied yes. Burkett next asked if he could see appellant's arms. As appellant started to push up one of his sleeves, Burkett asked appellant if there were any narcotics on the premises at that time. Appellant replied that there were. According to Burkett, appellant appeared all this time to be speaking "freely and voluntarily."

Burkett immediately asked where the narcotics were. Appellant said that he would have to ask his wife. Appellant then turned to Mrs. Wright and said, "Where is the stuff?" Mrs. Wright looked at him "with a blank look." Appellant said, "Tell the man where the stuff is." She then pointed toward the kitchen and said, "It is under the sink." Burkett walked into the kitchen, which was visible from the living room where this conversation had taken place, opened the cupboard beneath the sink, and looked inside. Mrs. Wright then said, "No, it is not down below. It is on a little shelf under the sink." Burkett then saw a small shelf just inside the cupboard door, where he found a small black purse.

This purse contained, in addition to an employee payment voucher of Mrs. Wright's and a rent receipt of hers, a spoon, some balloons, a medicine dropper, and two hypodermic needles. The end of the spoon appeared to have been burned and the bowl of the spoon contained a powdery residue. One of the balloons also contained some powder. Burkett formed the opinion, based on his training and experience as a narcotics officer, that this equipment was a narcotics injection outfit, that the powder in the balloon was approximately 4 grams of heroin, and that the powdery residue in the spoon possibly contained morphine.

Burkett asked the Wrights and Valdez who owned this contraband and appellant replied, "It's mine." Burkett then placed the Wrights and Valdez under arrest and advised them that they had a right to remain silent and to have an attorney during all proceedings, that if they were without funds an attorney would be furnished them free of charge by the state, and that anything they said would be used against them.[1] He

---

. [1]The reporter's transcript actually reads "anything would be used against them." But, assuming Burkett's testimony was correctly heard and transcribed, he obviously misspoke on the stand.

then asked each of the three if each understood this advice and each responded in the affirmative. The powder in the balloon was later established to be heroin.

Appellant, Mrs. Wright, and Valdez were then taken to the Lakewood sheriff's station. On the way, at appellant's request, the officers stopped at his brother's residence and left the Wrights' approximately year-old daughter with a woman who was apparently appellant's sister-in-law.

The two officers booked the Wrights and Valdez at the Lakewood station. Burkett then questioned appellant and his wife together for a half to three-quarters of an hour. Appellant stated that he had been using narcotics approximately five months, had not taken narcotics during the previous week, and had been seeing a doctor about his addiction problem. Mrs. Wright stated that she had started using narcotics about the same time as her husband and that they had been taking codeine, a synthetic opiate prescribed by a doctor. Appellant admitted, however, that he, and possibly Valdez, had "fixed" at about 2 p.m. that afternoon from five grams of heroin he had purchased from Valdez for $50. Mrs. Wright and Valdez also admitted they had used heroin that day. The heroin which the officers had found under the sink was apparently the residue of this purchase. Valdez was then brought in and appellant repeated his statement in Valdez' presence.

During this interrogation appellant appeared to be under the influence of an opiate but he was not in a stuporous condition. The pupils of his eyes did not contract when exposed to light. He was in a "general euphoric condition," with "a false sense of well-being," and he seemed "[l]ike he really didn't care what was happening to him." He was very slow and definite in his speech and movements.

Appellant's condition during this interrogation was very similar to his condition at the apartment. Burkett examined appellant's arms with a small lighted magnifying glass and found two fresh puncture wounds directly over a vein inside his right elbow, of a type indicating a nonprofessional injection of an opiate.

Appellant took the stand in his own defense. He testified that he and his wife had been using heroin for four and a half or five months prior to their arrest and that Valdez had occa-

admission of his ownership of the contraband, which Burkett found, preceded or followed his arrest and the *Miranda* warnings and waiver. It seems, however, to have preceded it.

sionally been their supplier. They had gone to a Dr. Julian for help with their problem and to retain their baby daughter. Dr. Julian had first advised them to commit themselves to a hospital but they did not want to do this because they thought this might cost them their baby daughter. Dr. Julian then prescribed codeine pills which they apparently were taking in April prior to their arrest for the pain associated with withdrawal from heroin. On the day of his arrest, appellant had taken two of these pills in the morning and one on arriving home from seeking work. He had not, however, taken any heroin for at least 10 days before his arrest.

Appellant's account of the facts leading up to his arrest differed significantly from that related earlier, which is based on Burkett's testimony. According to appellant, immediately after Burkett and Rodriguez entered the Wrights' apartment, Burkett asked appellant where "the stuff" was and Rodriguez started to search the kitchen. Burkett then asked appellant if he had ever used the stuff and appellant replied that he had. Burkett then examined appellant's arms and asked him when he had last used the stuff. Appellant replied that it had been approximately a week or two earlier. Burkett thereupon accused appellant of being "loaded." Appellant replied that he had been taking codeine and pointed out the codeine bottle to Burkett.

After Burkett had checked the arms of Mrs. Wright and Valdez, he started searching the kitchen. As Burkett started to look under the sink Mrs. Wright whispered to appellant that she had gotten some stuff. Burkett apparently overhead this remark and suggested that they tell him where it was because otherwise the officers would bring in a crew and give the place a going over. Appellant told his wife to tell Burkett where it was and she then did so.

Appellant had not previously seen the black purse containing the contraband, but after Valdez had advised him to "cop out" in order to save his wife, he told the officers untruthfully that the purse was his. Later at the station for the same reason, and out of concern for the welfare of his baby daughter, who needed the care of her mother, appellant told the officers untruthfully that he had purchased the heroin, which they had found in the apartment, for $50 from Valdez.

On this appeal from a conviction, however, we are bound to accept as true all evidence in support of the verdict and all favorable inferences which may reasonably be drawn therefrom. (See *People* v. *Moseley*, 240 Cal.App.2d 859, 863 [50 Cal.Rptr. 67].)

## The *Miranda* Error

*Miranda* permits no questioning of a suspect in custody without first informing the suspect in warning fashion of his privilege against compulsory self-incrimination and without a subsequent waiver by him of that privilege. Custodial interrogation is defined in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way*" (italics added), and as being equivalent in meaning to the words, as used in *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], "an investigation focusing on an accused." (384 U.S. at p. 444, fn. 4 at p. 444 [16 L.Ed.2d at p. 706].) *Miranda* does not, however, require prior warnings and a waiver as a preliminary to "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process." (384 U.S. at p. 477 [16 L.Ed.2d at p. 725].)

"Custody" was further defined in *People* v. *Arnold*, 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515], as arising if a suspect, as a reasonable person, is led to believe that he is physically deprived of his freedom of action in any significant way. In *People* v. *Ceccone*, 260 Cal.App.2d 886, 892-893 [67 Cal.Rptr. 499], this court held that the custodial stage of field interrogation arises, "at the latest," at the point when the investigating officer (see Pen. Code, § 836) has probable cause to believe that the person being questioned has committed an offense. (Cf. *Orozco* v. *Texas*, 394 U.S. 324 [22 LEd.2d 311, 89 S.Ct. 1095].)

In the case of a felony this point is reached when the officer has probable cause for arrest. At this point the officer cannot be expected to allow the suspect to leave and the suspect's reasonable expectations are not otherwise. The compulsion of custody therefore then attached notwithstanding the subjective intent otherwise of the interrogator. (See *People* v. *Chavira*, 253 Cal.App.2d 928, 932 [61 Cal.Rptr. 407].)

When Officers Burkett and Rodriguez went to the Wrights' apartment, they reasonably suspected, on the basis of what they had learned from Scofield, that narcotics activity involving both appellant and his wife was then going on there. Scofield was a reliable informant by reason of his dual status as an off-duty deputy sheriff and as a concerned private citizen who had personally heard part of what clearly appeared

to be illegal narcotics purchase transactions made for both appellant and his wife. (See *People* v. *Melchor,* 237 Cal.App. 2d 685, 690-693 [47 Cal.Rptr. 235]; *People* v. *Lewis,* 240 Cal. App.2d 546, 549-551 [49 Cal.Rptr. 579].) These officers therefore had probable or reasonable cause to arrest both appellant and his wife when they entered the apartment. (Cf. *People* v. *Ingle,* 53 Cal.2d 407, 410-413 [2 Cal.Rptr. 14, 348 P.2d 577].)

This being the case, custody had attached to the Wrights prior to any questioning of appellant by Burkett. ■■■ But, in addition, following his opening investigatory question to appellant, Burkett's interrogation of appellant became accusatory in nature. We refer to his second and third questions which were whether appellant was a narcotics user and whether there were any narcotics then on the premises. Health and Safety Code section 11721 makes the use of narcotics a misdemeanor "excepting when administered by or under the direction of a person licensed by the State to prescribe and administer narcotics." Burkett knew at the time at which he asked this question that appellant had probably been using heroin from an illegal source.

■■ The third question was likewise accusatory. Health and Safety Code section 11500 makes possession of any narcotic, other than marijuana, except upon the regular prescription of an appropriately licensed person, a felony. This offense is proven when it is shown "that the accused exercised dominion and control over the drug with knowledge of its presence and narcotic character." (*People* v. *Redrick,* 55 Cal.2d 282, 285 [10 Cal.Rptr. 823, 359 P.2d 255].) All three elements of this crime may be established circumstantially. (See *People* v. *Groom,* 60 Cal.2d 694, 696-697 [36 Cal.Rptr. 327, 388 P.2d 359].) Before asking this question, Burkett knew appellant lived in the apartment and was a narcotics user. Consequently, in asking this question under these circumstances he was asking appellant in effect to confess the crime of possession of heroin for which he was later charged and convicted.

■■ Accordingly we hold that Burkett's interrogation was custodial within the meaning of *Miranda* and that the failure to give appellant the warnings required by *Miranda* and to obtain from him the waiver *Miranda* also commands prior to the interrogation was federal constitutional error.

The Attorney General argues that this conclusion is inconsistent with decisions of two other local divisions of this court in *People* v. *Merchant,* 260 Cal.App.2d 875 [67 Cal.Rptr.

459], and *People* v. *Autterson*, 261 Cal.App.2d 627 [68 Cal. Rptr. 113], hear. den. Both cases are, however, distinguishable upon their facts. In *Merchant*, an appeal from a conviction of the possession of a concealable firearm by a felon (Pen. Code, § 12021), the defendant was questioned by the police through a screen door on the basis largely of information from an unproven informant. He was asked to confirm his identity as well as the facts that he was an ex-convict and that he did have a gun in his possession. The court held that *Miranda* warnings and waiver were not required prior to such questioning because at the time of such questioning the police inquiry was still in its investigatory stage, as Merchant was not then in custody, suspicion had not yet focused upon him, and the questioning was itself investigatory in purpose. (260 Cal.App.2d 877-881.) In *Autterson*, an appeal from a conviction of possession, etc., of tear gas (Pen. Code, § 12420), the officers went to defendant's premises to investigate an advertisement in an effort to determine whether a crime had been committed and if so, who had committed it, and the officers' questioning of the defendant had "none of the characteristics of a process of interrogation that lends itself to eliciting incriminating statements." (261 Cal.App.2d at p. 636.)

The Attorney General has further pointed out that the foregoing analysis runs directly contrary to Burkett's own testimony. According to Burkett he did not subjectively believe that he had probable cause to arrest appellant until he either discovered narcotics or signs of narcotics usage in the apartment and that was why he delayed appellant's arrest until the former of the two events had occurred. The arrest actually occurred after both the initial questioning of appellant and the search of the apartment.

▮▮▮ Probable cause for arrest is not, however, a matter of the arresting officer's subjective intent. ▮▮▮ Probable cause has long been defined by the courts essentially as a state of facts known to the arresting officer which would lead him as a man of ordinary care and prudence to believe that the person he is arresting has committed an offense. (*People* v. *Talley*, 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564]; *People* v. *Hillery*, 65 Cal.2d 795, 803 [56 Cal.Rptr. 280, 423 P.2d 208].)

▮▮▮ Courts, and not arresting officers, have the ultimate responsibility of determining whether a particular officer's belief was based objectively upon reasonable cause. (See *People* v. *Fischer*, 49 Cal.2d 442, 446 [317 P.2d 967]; *People* v.

*Phillips,* 249 Cal.App.2d 663, 668-669 [57 Cal.Rptr. 665], hear. den.)

### The Admissibility of the Station House Confession

Appellant has also challenged the admissibility of his more detailed and damaging station house confession upon the ground that his waiver at the apartment of his constitutional privilege against compulsory self-incrimination was ineffective. He asserts that this waiver was ineffective for two reasons—(1) his drugged condition which made him unaware of the consequences of what he was doing and (2) the lack of an express waiver.[2]

We believe that appellant's waiver nevertheless was an effective waiver. It is true that he was in a euphoric drugged condition when he made the waiver, but he knew what was happening and what he was doing. Both at this time and later on at the station house he was intent upon saving his wife from incarceration so that she could return home and care for their baby daughter. According to his own testimony this is why he knowingly and deliberately lied to the officers both at the apartment and at the station house regarding his ownership of the contraband which they had found in the apartment.

An express waiver is not required by *Miranda.* (*People* v. *Johnson,* 70 Cal.2d 541, 557 [75 Cal.Rptr. 401, 450 P.2d 865].) "Once the defendant has been informed of his rights, and indicates he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them." (*Idem* at p. 558.)

### The Prejudicial Direct Effect of the *Miranda* Error

We must now consider whether the admission in evidence of appellant's confession at the apartment of knowingly possessing narcotics[3] there constitutes reversible error in itself and

---

[2]Appellant could have challenged the effectiveness of his waiver on the further ground that prior to the station house interrogation he was not specifically offered the immediate services of counsel. But, it has been held that such an offer is not required by *Miranda.* (See *People* v. *Johnson,* 70 Cal.2d 541, 557 [75 Cal.Rptr. 401, 450 P.2d 865].)

[3]It is at least arguable whether appellant's incriminating admissions at the apartment prior to the *Miranda* warnings and waiver technically constituted a confession which is "a declaration by a person that he is guilty of the crime with which he is charged." (See Witkin, Cal. Evidence (2d ed. 1966) § 474, p. 436.) But, as we have previously indicated, we believe these admissions were tantamount to a confession and therefore should be so treated.

also rendered inadmissible under the fruit of the poisonous tree doctrine (1) the heroin and the injection kit discovered in the search which was triggered by his first confession, (2) his subsequent station house confession on the ground that it was impelled by his first confession, and (3) his testimony at the trial for the same reason.

We must first consider whether the erroneous admission in evidence of appellant's first brief and very general confession —the one at the apartment—automatically in itself requires reversal because of this constitutional error and regardless of the strong evidence otherwise of appellant's guilt. Ordinarily this is the case. (See *In re Morse,* 70 Cal.2d 702, 709 [76 Cal.Rptr. 385, 452 P.2d 601]; *People* v. *Fioritto,* 68 Cal.2d 714, 720 [68 Cal.Rptr. 817, 441 P.2d 625].) But where, as here, the erroneously admitted confession is followed by the discovery of the admissible contraband and the much more damaging and detailed admissible station house confession, it can be argued that this rule of automatic reversal should not apply and that instead the harmless error rule of *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824] should govern. ▮▮▮ Under this rule the test is whether there is any reasonable possibility that the inadmissible confession contributed to the verdict against appellant or, stated otherwise, whether we can declare our belief beyond a reasonable doubt that this error was harmless. (See *People* v. *Morse,* 70 Cal.2d 711, 728-730 [76 Cal.Rptr. 391, 452 P.2d 607]; *People* v. *Powell,* 67 Cal.2d 32, 51-54 [59 Cal. Rptr. 817, 429 P.2d 137]; *People* v. *Spencer,* 66 Cal.2d 158, 163 [57 Cal.Rptr. 163, 424 P.2d 715]; cf. dictum *People* v. *Price,* 63 Cal.2d 370, 377 [46 Cal.Rptr. 775, 406 P.2d 55].)

▮▮▮ As we have already indicated, we believe, that properly construed, appellant's admissions at the apartment were tantamount to a confession of the crime charged against him —the illegal possession of heroin—and therefore should be treated as a confession. But if we are wrong in this conclusion, we are still of the opinion that reversible error was committed under *Chapman* in receiving these admissions in evidence. In an effort to determine whether it is reasonably possible that this constitutional error, with respect to the weakest of the three principal items of evidence tending to prove appellant's guilt, contributed to the verdict against appellant, we have, pursuant to rules 12(a) and 30 of the California Rules of Court, added to the record on appeal the oral argument of counsel to the jury. From a transcript of this argu-

ment we have discovered that the prosecutor in his opening argument to the jury made explicit references to these admissions of appellant and dwelt upon the probability that they were more trustworthy than appellant's testimony.[4] Under these circumstances reversal under *Chapman* is required.

### The Nonprejudicial Indirect Effect of the *Miranda* Error

However, as partially indicated in *People* v. *Spencer, supra,* 66 Cal.2d 158, 163-165, we must still determine whether under *Chapman* the erroneous admission of the first confession rendered inadmissible as well the contraband and the station house confession as fruit of the poisonous tree and whether under *Harrison* v. *United States,* 392 U.S. 219 [20 L.Ed.2d 1047, 1051-1052, 88 S.Ct. 2008] the first confession impelled appellant's testimony respecting the crime.

We have decided that this constitutional error did not have this effect. ▉ With respect to the contraband this was discovered during the lawful search. The search was lawful, notwithstanding its otherwise tainted origin, because, independently of such origin, it occurred incident to a lawful arrest made upon probable cause. Where, as here, the search and the arrest were substantially contemporaneous, it does not matter that the arrest followed rather than preceded the

---

[4]These excerpts from the prosecutor's opening argument are:

"They came in and they asked, 'Do you use heroin?' And both of them said yes.

"They said, 'Where is it?' And he said, 'Dear, tell them where it is,' and she said, 'It is under the sink.' . . . — and he tells the Officers, 'It is mine,' when they asked him whose is it, and he said, 'It is mine, . . .'

"Then he tells us that he took the blame because he wanted to get his wife off so she could be with the baby because he is worried about their baby. That is what he tells us, but you all know from experience and putting yourself in a similar spot—when you are apprehended and when you first talk to the Police, many people blurt it out. It is sort of a relief to get it out.

"He says no, but you can't believe him. Usually he is deflated like you catch a child in an act of doing something he shouldn't do and he blurts it out. If you catch him later he may fabricate it if he has time.

"Then later, after consulting with possibly each other, with attorneys, with parents, with friends, with other persons in the jail, so called as we call jail-house lawyers, so now he is telling a different story in court and he says, 'Oh, I only said it because I wanted to save my wife.'

"I think they loved the child. He is concerned about the wife and he is concerned about himself and at that time when they caught him right now, they knocked on the door out of the clear blue sky and they said, 'Have you used it?' And they were so deflated and so caught off guard that they blurted out the truth at that time. But after they talked to an attorney, do you think they would say the same thing?

"Obviously not because at that time after talking to an attorney they are not concerned with the truth of the matter. They are concerned with building a defense."

search. (See *People* v. *Terry,* 70 Cal.2d 410, 428 [75 Cal. Rptr. 199, 450 P.2d 591]; *People* v. *Cockrell,* 63 Cal.2d 659, 666-667 [47 Cal.Rptr. 788, 408 P.2d 116].) It should be noted also that probable cause to arrest existed at the outset of the search. (See *People* v. *Marshall,* 69 Cal.2d 51, 61 [69 Cal. Rptr. 585, 442 P.2d 665].)

Appellant's subsequent station house confession was not impelled by his earlier confession at the apartment. According to his own testimony he made the second confession in order to keep his wife out of prison so that she might return home and care for their baby daughter. This proof of an independent motive for this confession satisfied the People's burden of proving beyond a reasonable doubt that the causative link between the two confessions was broken. (See *People* v. *Spencer, supra,* 66 Cal.2d 158, 168, and the cases discussed and cited in fn. 8 thereof.)

There remains the question of whether under *Harrison, supra,* we can say that in this case the People have discharged their burden of proving beyond a reasonable doubt that the first confession at the apartment neither induced nor impelled appellant's testimony respecting the crime. In order to deter the police from the use of illegal means of obtaining evidence, the United States Supreme Court about 50 years ago originated the rule that, generally speaking, not only such evidence itself, but any further evidence as well, obtained by means of such evidence, would be excluded. (*Silverthorne Lbr. Co.* v. *United States,* 251 U.S. 385, 391-392 [64 L.Ed. 319, 321, 40 S.Ct. 182, 24 A.L.R. 1426]; *Nardone* v. *United States,* 308 U.S. 338, 339-341 [84 L.Ed. 307, 310-312, 60 S.Ct. 266]; *Wong Sun* v. *United States,* 371 U.S. 471, 484-485 [9 L.Ed.2d 441, 453-454, 83 S.Ct. 407].)

This is the so-called fruit of the poisonous tree doctrine or the exclusionary rule with respect to derivative evidence. Like proximate or legal cause, as distinguished from cause in fact in the law of torts (see Rest. 2d Torts, § 431, com. a) from its inception the court, which created the doctrine and rule, has repeatedly made clear that it does not always extend the full length of causation in fact. (See *Wong Sun* v. *United States, supra,* 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) The "independent source" limitation appeared in *Silverthorne* itself (251 U.S. 385, 392 [64 L.Ed. 319, 321]). The dissipation of the taint of the illegality by attenuation exception was created in *Nardone* (308 U.S. 338, 341 [84 L.Ed. 307, 312]). In *Wong Sun* the court spoke of "an intervening inde-

pendent act of free will'' and whether the challenged evidence had been come at by exploitation of the primary illegality or instead by means sufficiently distinguishable to be purged of the taint of that illegality. (371 U.S. 471, 486, 488 [9 L.Ed.2d 441, 454, 455].) ▮▮▮ It seems clear that the causative chain may be effectively broken by intervening independent acts. (See *People* v. *Sesslin,* 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321]; *People* v. *Johnson, supra,* 70 Cal.2d 541, 547-549.)

In this case appellant's first confession at the apartment was followed by the lawful search of that apartment which resulted in the finding of the contraband there. This event was followed immediately by the *Miranda* warnings to appellant and the requisite waiver by him. These last mentioned two events at the very least constitute factors to be considered in deciding whether appellant's subsequent testimony was induced by his first confession. (See *People* v. *Johnson, supra,* 70 Cal.2d 541, 551.) Then came appellant's detailed and quite damaging station house confession. By the time of the trial appellant, in deciding whether to testify, was confronted by not merely his first confession at the apartment that he, an admitted narcotics user, had narcotics in the apartment, but by as well the heroin and the injection kit themselves, which the officers had found there, and by his station house confession that he had bought this heroin himself earlier that very afternoon and had then injected himself with it. As indicated earlier, of these three items of evidence tending to prove his guilt, his first generalized confession is by far the weakest in probative effect. Under these circumstances we have no hesitancy in declaring our belief beyond a reasonable doubt that the erroneous admission in evidence of appellant's first confession neither induced nor impelled his subsequent testimony.

## Remaining Points

The two remaining points raised by appellant on this appeal do not require discussion since there should be no occasion for the prosecutor on retrial to engage in the challenged conduct.

The order denying defendant's motion for new trial is reversed.

Ford, P. J., and Schweitzer, J., concurred.