[Crim. No. 15814. Second Dist., Div. Five. Feb. 18, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY VINCENT MUNIZ, Defendant and Appellant.

## COUNSEL

Mel Albaum, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—In case number A-230383 defendant was charged in count I with illegal possession of a machine gun (Pen. Code, § 12220)—of which charge he was acquitted—and in counts II and III with batteries on the persons of two peace officers, Frank C. Farey and Thomas C. Kelley (Pen. Code, § § 241, 243). The information charged and the jury found to be true that each officer was, at the time of the commission of the batteries, engaged in the performance of his duties and that defendant reasonably should have known this. Consequently the provision of section 243 of the Penal Code which then raised a battery on a police officer under such circumstances from a misdemeanor to a felony carrying a maximum punishment of 10 years in prison, came into play. Defendant was, however, granted probation subject to a six month's term in the county jail. At the same time he was found in violation of probation imposed in another case, number A-218307. Probation in that case was modified, but somewhat extended and conditioned on an additional term of six months in the county jail, to be served concurrently with the county jail term imposed in case number A-230383.

Defendant then filed two notices of appeal, which purported to appeal from various nonappealable rulings, as well as from the two orders granting and modifying probation. These later appeals are properly before us and are adequate to raise all of defendant's contentions. All other purported appeals must be and hereby are dismissed.

The facts may be very briefly stated. On February 25, 1968, Officer Farey stopped a car in which defendant was riding as a passenger for "loud pipes." (Veh. Code, § 27150.) According to Farey defendant appeared to reach down toward the floorboard of the car when it came to a stop. Farey further testified that while his partner, Officer Beno, was writing a citation he, Farey, noticed in plain view, on the passenger side, 5 to 7 inches of the stock of a weapon on the floor of the car; the rest was covered by a jacket.

The police version of later events is as follows: the driver and defendant

were arrested for a violation of section 12031, subdivision (a) of the Penal Code—carrying a loaded firearm in a vehicle. Defendant attempted to flee. Officer Farey grabbed his arm. Defendant turned and both he and the officer fell to the ground. There was a struggle between them, but no punches were thrown. Defendant was taken to Hollenbeck station. Farey's stated purpose was to "get advice and authority from our detectives who advise booking."[1] This was a routine procedure, during which defendant was placed in a "detaining cell," next to the watch commander's office. While defendant was in that cell Sergeant Kelley, who had not been involved in the arrest, and Officer Farey heard loud bangs from defendant's cell. Sergeant Kelley, Officer Farey and Officer Beno entered the cell with a restraining device. Defendant then committed a battery on Officer Farey. The restraining device was applied to defendant's hands, but he managed to free himself. The same three officers reentered the cell and defendant then committed further batteries on Officer Farey and Sergeant Kelley.

The defense version of the events, both those at the scene of the arrest and those at the station, was quite different.

As far as the machine gun is concerned, the driver of the car, one Infante, assumed full responsibility for its presence and claimed that Muniz knew nothing about it. He also testified that the entire gun was wrapped in a jacket and that there was no possible way anyone could have seen it or known that it was there. At the time of defendant's trial Infante had pleaded guilty to a violation of section 12220.

Defendant denied having known anything about the gun or the reason for his arrest until Infante told him on the way to the station. He denied the furtive movement allegedly observed by Farey. He admitted a tussle with Farey at the scene of the arrest, but claimed that Farey was the aggressor. At Hollenbeck station about four or five officers were apparently waiting for defendant and Infante and greeted them with taunts and insults. Before Muniz was put into the detention cell he asked to be permitted to go to the restroom. He was told to relieve himself on the floor of the cell, which he did not do. After being in the cell for some time he knocked on the cell window. When the door was opened he again asked to be permitted to use the restroom. The request was again denied and then there followed further taunts by the officers who, Muniz thought, were trying to provoke him into an assault.[2] Muniz did not rise to the bait because he knew that he would

---

[1]It was Officer Farey's intention to book defendant at the central jail downtown. The reason for the stopover at Hollenbeck station was merely to obtain authority to do so.

[2]It is very hard to tell from Muniz' testimony just which officer did or said what. It is, however, apparent that both Farey and Kelley were present.

be beaten if he raised a hand. At one point Farey hit him on the left side of his face. He was then thrown on the floor and the restraining straps were put around his wrists. He passed out. The door to the cell was locked. He knocked on the door. An officer outside the cell made an obscene gesture with his middle finger. Kelley then entered the cell and engaged in further insulting talk. At one point, without provocation, he hit Muniz in the stomach. Muniz fell down and hit his head against a bench. He was raised up by Kelley. Several officers were beating him. He was then laid down on the bench. Attempting to protect himself he started to kick. These kicks were the only batteries he committed. Eventually he was taken to Parker Center where, supposedly, further mistreatment took place.

On appeal Muniz makes the following claims: 1. his arrest was unlawful; and 2. the illegality of his arrest reduced the batteries to misdemeanors. (*People* v. *Curtis,* 70 Cal.2d 347, 353-355 [74 Cal.Rptr. 713, 450 P.2d 33].)

We cannot say that the arrest was illegal as a matter of law. Although Farey obviously did not have probable cause to believe that the firearm was loaded and therefore announced the wrong section of the Penal Code when making the arrest, his error is immaterial. (*People* v. *Walker,* 273 Cal. App.2d 720, 724-725 [78 Cal.Rptr. 439]; *People* v. *Wright,* 273 Cal.App. 2d 325, 335-336 [78 Cal.Rptr. 75].) The furtive movement which he observed, coupled with the apparent attempt to hide the weapon in a jacket, even though on his version of the facts the attempt was only partially successful, objectively gave him sufficient reason to suspect some violation of the Dangerous Weapons' Control Law.

But this does not dispose of the problem. The case was tried before *People* v. *Curtis, supra.* In that case it was held that section 834a of the Penal Code, enacted in 1957, which makes it illegal to resist an unlawful arrest, was only meant to eliminate the common law defense of resistance to unlawful arrest, but not to make such resistance a new substantive crime. That portion of section 243 of the Penal Code which raises battery, a misdemeanor, to felony status where the victim is a peace officer engaged in the performance of his duties, does not come into play where the officer makes an illegal arrest, simply because "[a]n officer is under no duty to make an unlawful arrest." (*Jackson* v. *Superior Court,* 98 Cal.App.2d 183, 189 [219 P.2d 879].) It goes without saying, of course, that neither is it the duty of officers to taunt or beat persons arrested.

With respect to count II, the charged battery of Farey, we do not know whether the jury's verdict is based on the scuffle at the scene of arrest or the events in the detention cell. As far as the battery at the time of the arrest is concerned, it certainly would only have been a misdemeanor if Farey had no probable cause to make the arrest. That issue was never submitted to the jury. ■ Normally it is not the jury's function to resolve factual conflicts on the issue of probable cause (*People* v. *Gorg,* 45 Cal.2d 776, 780-781 [291 P.2d 469]); where, however, there is a question of the applicability of the *Curtis* rule, the legality of the arrest becomes an essential part of the corpus delicti and any factual conflict must be resolved by the jury. (*People* v. *Soto,* 276 Cal.App.2d 81, 87 [80 Cal.Rptr. 627].)

There was, of course, a very decided factual conflict in this case. According to the defense testimony the gun was completely hidden from view. ■ The stop for a violation of section 27150 of the Vehicle Code did not authorize a search of the interior of the car. (*People* v. *Blodgett,* 46 Cal.2d 114, 116-117 [293 P.2d 57].)

■ The failure to submit the issue of the legality of the arrest to the jury was demonstrably prejudicial. If the jury had believed that the gun was in plain sight, as Farey testified, it seems unlikely that it would have acquitted defendant on the possession count. We have in mind Farey's testimony that defendant reached down toward the floorboard when the car came to a stop and that gun was on the passenger side of the car.

The People, however, contend that the illegality of the arrest is immaterial, because defendant's conviction for a felony-battery is adequately supported by his acts in the detention cell when "the arrest had long since ended."[3]

We need not decide at what point following an illegal arrest the arresting officer again becomes "engaged in the performance of his duties" or, the extent, if any, to which the *Curtis* rule applies to batteries on other officers,

---

[3]The People also argue that since the defense did not file a demurrer for uncertainty (Pen. Code, § 1004, subd. 2) for the purpose of making the prosecution specify whether it based the charge of battery on Farey on the scuffle at the scene of the arrest or on the incident at the station, we should review count II solely from the point of view of the later incident. Although it makes no difference to the disposition of this appeal, we point out that a demurrer would only have reached a defect apparent on the face of the pleading. (Witkin, Cal. Criminal Procedure (1963) § 236.) What defendant should have done was to demand that the People make an election. (*People* v. *Williams,* 133 Cal. 165, 169 [65 P. 323].) No such demand having been made the People are deemed to have elected, as the basis of count II, "the first evidence which would tend in any degree to prove" the charge. (*People* v. *Williams, supra,* 133 Cal. at p. 169; *People* v. *Byrnes,* 84 Cal.App.2d 64, 70-71 [190 P.2d 286].) Such evidence related to the scuffle at the time of the arrest.

charged with the custody of the arrestee, who are unaware of the initial illegality. The failure of the trial court to anticipate the holding of *Curtis*[4] permeated the record with error in other respects.

The parties argue the possible application of *Curtis* to this case as if everything depended on the legality of defendant's arrest and on the answer to the question whether, at the police station, he was still resisting an illegal arrest; but if we focus our attention on these issues, we lose sight of the true impact of *Curtis*.

*Curtis* did not create a privilege to commit batteries on peace officers who make illegal arrests. In fact, by holding that section 834a of the Penal Code is constitutional it nailed down the proposition that resistance to an illegal arrest is no defense to a charge of battery. What *Curtis* did do is to make the question whether the battery is a misdemeanor or a felony depend on the question whether the officer is engaged in the performance of his duties.[5] Though the problem will, in the vast majority of cases, undoubtedly arise in the context of resistance to arrest,[6] this is not necessarily so. For example in *People* v. *Hood,* 1 Cal.3d 444, 450 [82 Cal.Rptr. 618, 462 P.2d 370], the defendant was convicted of assault with a deadly weapon upon a peace officer. (Pen. Code, § 245, subd. (b).) Hood claimed that when the officer in question turned to him to make an apparently legal arrest, he thought that the officer was drawing his gun and was going to shoot him. The court said: "This evidence was sufficient to raise the question whether Officer Elia had become angered and ceased to be engaged in the performance of his duties, or whether defendant could reasonably have so believed."

Similarly, in the case at bar—and quite apart from the legality of the arrest—there was much evidence of conduct by Officer Farey and Sergeant Kelley which, if true, caused them to be no longer engaged in the performance of their duties. For obvious reasons, however, the question of whether the officers were engaged in the performance of their duties was never explored factually as such, nor were any of the court's instructions

---

[4]Actually, of course, the trial court was bound to apply the pre-*Curtis* law announced by the decisions which *Curtis* disapproved. (*People* v. *Curtis, supra,* 70 Cal.2d 347, 355, fn. 6.)

[5]It is noted that since November 13, 1968, even a battery on an officer may be punished as a misdemeanor. If, after a retrial, defendant is again convicted, he will have the benefit of the new statute. (*People* v. *Francis,* 71 Cal.2d 66, 75-78 [75 Cal.Rptr. 199, 450 P.2d 591].)

[6]Thus it is noted that practically all the reported decisions dealing with section 148 of the Penal Code (resisting, delaying or obstructing an officer) deal with arrest situations.

directed to that issue.[7] The intervening change in the law forces us to say that it was error for the court not to have instructed on the effect of such evidence. (*People v. Hood, supra,* 1 Cal.3d at p. 450; *People v. Curtis, supra,* 70 Cal.2d 347, 359; *People v. Soto, supra,* 276 Cal.App.2d 81, 85-87.)

Such instructions as were given did not touch on the problem. Basically the court merely defined battery, informed the jury that one has to submit to an arrest, that a policeman "when lawfully engaged in the conduct of his duties may use reasonable force in effecting an arrest"[8] and stated the law with respect to the right of self defense. While the court also informed the jury that to find defendant guilty on counts II and III, it had to find that the batteries were committed on peace officers engaged in the performance of their duties and that defendant knew or should have known that fact, there was no instruction to guide the jury on those issues.

The lack of instructions on the officers' status was necessarily prejudicial, because "it deprived defendant of his constitutional right to have the jury determine every material issue presented by the evidence." (*People v. Hood, supra,* 1 Cal.3d at p. 450.) Further, even if we were to apply the standard of *People v. Watson,* 46 Cal.2d 818, 835-837 [299 P.2d 243], we would be forced to reverse. Although defendant's own testimony showed him to be a difficult prisoner,[9] that very evidence may have created a reasonable doubt concerning the People's version of the events at the station.[10] Some of the police testimony was curiously defensive.[11] The jury's rejection of

[7]For the sake of simplicity we have, throughout this opinion, concentrated our attention on that portion of section 243 which requires, as part of the corpus delicti, that the peace officer be engaged in the performance of his duties. For completeness we note that a battery cannot be punished as a felony unless, in addition, the defendant knows or reasonably should know that the victim is a peace officer or fireman engaged in the performance of his duties.

[8]Since the jury was never told what was lawful conduct of an officer's duties, the use of the word "lawfully" was meaningless.

[9]Advised of his constitutional rights and asked whether he understood them, he promptly answered "no." He became "pretty salty" when refused the privilege of going to the toilet. He responded to the obscene gesture by making "funny faces" and a similar gesture. He was only "physically" peaceful.

[10]Before denying defendant's motion for a new trial, the trial court conceded: ". . . I believe that there was probably some provocation in this case." Later it told defendant: "As I also mentioned, I think you probably were given some aggravation by the police officers in this case. But you are not the only one in society that has to put up with aggravation."

[11]"Q. Did you see Sergeant Kelley punch him? A. I saw him deliver a blow to the midsection. Q. Isn't that called a punch? A. It is a blow to the midsection. Q. Doubled up fist? A. As I recall, yes, it was doubled up. Q. You throw it just like

defendant's claim of self-defense is not, as *Hood* demonstrates, necessarily inconsistent with a reasonable doubt on the officers' status as being engaged in the performance of their duties. The total disparity between the People's and defendant's accounts of what took place makes it futile to try and list the legal theories under which defendant could have been guilty of battery on officers who were not engaged in the performance of their duties.

One final argument by the People must be rejected. It is primarily directed to the scuffle at the scene of the arrest. The People point out that trial tactics or inspired incompetence caused defendant's trial counsel not to object to the admissibility of the machine gun as being the fruit of an illegal arrest. From this premise it is argued that although defendant did not have to foresee *Curtis* (*People* v. *De Santiago*, 71 Cal.2d 18, 23 [76 Cal.Rptr. 809, 453 P.2d 353]; *People* v. *Hillery*, 62 Cal.2d 692, 711-712 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Kitchens*, 46 Cal.2d 260, 263 [294 P.2d 17]), the failure to object to the legality of the arrest with respect to count I, somehow disables defendant from taking adavntage of *Curtis*.[12]

We cannot agree. The trial court's duty to instruct on every element of the offense did not depend on any request from the defendant. Certainly the failure to object to the admissibility of the machine gun cannot be construed as an invitation to err with respect to the application of a rule of law not yet announced. (Cf. *People* v. *Phillips*, 64 Cal.2d 574, 580-581, fn. 4 [51 Cal.Rptr. 225, 414 P.2d 353].)

The judgment (order granting probation) in case number A-230383 is reversed. All other appeals in that case are dismissed. Since the only apparent reason for modifying the terms of probation in case number A-218307 was the conviction which we must reverse, the order in that case is also reversed and the court is ordered to reconsider the alleged violation of probation in light of the views set forth in this opinion. All other appeals in case number A-218307 are also dismissed.

Aiso, J., and Reppy, J., concurred.

A petition for a rehearing was denied March 4, 1970, and respondent's petition for a hearing by the Supreme Court was denied April 15, 1970.

---

a boxer throws a punch in the ring? A. I'm not that familiar with boxers fighting. Q. Ever seen a boxing match? A. I have. Q. Do they deliver blows in boxing matches? A. Yes, sir. Q. They have the same kind of blows that were delivered? A. I would say it was similar, sir."

[12]Since, as we have noted, both parties discuss the question of whether or not the officers were in the performance of their duties from the point of view of the legality of the arrest, the People's argument, if correct, is presented as a complete answer to defendant's position. In view of our holding that the record would support a finding that the officers were acting illegally in other ways, the People's point under discussion becomes relatively insignificant.