[Crim. No. 10872.   In Bank.   Apr. 10, 1969.]

In re JOSEPH BERNARD MORSE on Habeas Corpus.

Joseph Bernard Morse, in pro. per., Benjamin Dreyfus, under appointment by the Supreme Court, and Garry, Dreyfus, McTernan & Brotsky for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Robert R. Granucci, Deputy Attorney General, for Respondent.

SULLIVAN, J.—Petitioner seeks a writ of habeas corpus on the ground that he is unlawfully imprisoned under a judgment of conviction of two counts of first degree murder. In 1962, a jury convicted petitioner of the first degree murder of his mother and sister and fixed the punishment on each count at death.[1] On his automatic appeal (Pen. Code, § 1239, subd. (b)) we reversed the judgment insofar as it related to the penalty and affirmed it in all other respects. (*People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) Retrial of the penalty issue resulted in verdicts of life imprisonment. Sentence upon those verdicts was imposed on August 21, 1964, and the judgment became final without appeal.

---

[1]Petitioner was at the same time convicted of an aggravated assault (Pen. Code, § 245) upon the person of one Ellen Young, and he was sentenced to prison for the term prescribed by law. He does not challenge this conviction in the instant proceeding.

704

In the instant proceeding[2] petitioner seeks collateral relief from the judgment insofar as it convicts him of two counts of first degree murder. (See fn. 1, *ante*.) He contends that each of two extrajudicial confessions introduced against him during the trial on the issue of guilt was obtained in violation of his constitutional right to counsel and that the judgment must, therefore, be vacated.

We first observe that these contentions may now be raised for the first time on collateral attack. Although petitioner's appeal was decided adversely to him on the question of guilt more than six months prior to June 22, 1964, the date of the decision in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], judgment on petitioner's penalty retrial was not entered until August 21, 1964. The time for taking an appeal (Cal. Rules of Court, rule 31) expired on August 31, 1964, the date of our first *Dorado* decision. The judgment was, therefore, not final prior to the date of *Escobedo*, and *Escobedo* and *Dorado* are applicable (*People* v. *Rollins* (1967) 65 Cal.2d 681, 691 [56 Cal.Rptr. 293, 423 P.2d 221]) to both guilt and penalty issues. (*People* v. *Ketchel* (1966) 63 Cal.2d 859, 863-866 [48 Cal.Rptr. 614, 409 P.2d 694].) Petitioner's failure to raise his present contentions by appeal from the judgment entered after his penalty retrial is excusable for two reasons. First, petitioner, unlike the defendant in *Escobedo*, did not request counsel prior to the obtaining of the two extrajudicial statements here in question. He was not required to anticipate that the *Escobedo* rationale would be applied in our *Dorado* decision (*People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]—decided on rehearing on January 29, 1965) to include cases wherein counsel was not requested.[3] Second, petitioner was not required to anticipate our *Ketchel* decision permitting the consideration of *Escobedo-Dorado* errors in his guilt trial on appeal following the penalty retrial. We therefore conclude that petitioner may presently raise such errors on collateral

[2]Petitioner filed in propria persona a petition for writ of habeas corpus in this court on February 21, 1967. We issued an order to show cause and appointed Benjamin Dreyfus, Esq., to represent petitioner in these proceedings.

[3]For this reason we also reject any contention that petitioner waived *Escobedo-Dorado* errors by failing to raise them at the penalty retrial. (See *People* v. *Doherty* (1967) 67 Cal.2d 9, 13-15 [59 Cal.Rptr. 857, 429 P.2d 177].) We said in *Doherty*: ''In the absence of special circumstances justifying an inference of knowing and intelligent waiver of an *Escobedo-Dorado* claim, we cannot assume such a waiver in a trial held before January 29, 1965. [Citations.]'' (Fn. omitted; p. 14.)

attack. (See *In re Shipp* (1967) 66 Cal.2d 721, 723-724 [59 Cal.Rptr. 97, 427 P.2d 761]; *In re Spencer* (1965) 63 Cal.2d 400, 404-406 [46 Cal.Rptr. 753, 406 P.2d 33].)

Two extrajudicial statements were introduced against petitioner during the trial on the issue of guilt. The first of these statement, as related at trial by Officer Rowland, is set forth in the footnote.[4]

was given in a police car enroute to the Chula Vista police station. Petitioner had earlier in the day informed the mother of his sister-in-law that he had found his mother and sister dead at his home. Police were contacted and they escorted petitioner to his home, where they found the bodies and commenced an investigation. Approximately two hours later, after blood-stained shoes and clothing had been found in petitioner's bedroom, he was placed in a police car for transportation to the station. At this time petitioner asked whether he was under arrest, and he was told that he was not. The

[4] "Q. [By the prosecutor.] All right. Now, you say, Officer, that you were in the car transporting the defendant to the police station, is that correct? A. [By Officer Rowland.] Yes, sir. Q. And about what time was he transported to the station? A. This would be sometime after 6:00 o'clock. I am not sure of the exact time. Q. All right, and who else was present in the car with you and the defendant? A. Sergeant Pauline and Reserve Sergeant Bell. Q. A reserve officer? A. Yes. Q. Was the defendant asked any questions in your presence, and did he give any answers, regarding the death of his mother and sister en route to the station? A. Yes, sir. Sergeant Pauline had a conversation with him regarding this. Q. And will you tell us, please, what was said, as best you recall it? A. Yes, sir. Sergeant Pauline told him that when we got to the station he would give him a pencil and paper so he could make some notes to refresh his memory, and they would probably ask him a lot of questions about where he had been, and so forth, and Morse said, 'I don't think that will do me any good, and prison won't help me. It must be something in my head.' At this time Sergeant Pauline said, 'You mean to make you kill them?' and he said, 'Yes.' Sergeant Pauline said, 'Did you kill them?' and he said, 'I guess so.' Q. Now, up to that point, or up to that conversation, had the defendant at any time said anything about that he was responsible for the deaths of his mother and sister? A. No, sir. Q. All right. Officer, was anything further said? A. Yes, sir. Q. What, do you recall? A. Sergeant Pauline asked him how it happened, and he stated he just walked in and did it. He asked him what he did it with, and he said 'A rock.' Sergeant Pauline asked him where he got the rock. He said, 'In the front yard.' Sergeant Pauline asked him, 'Was it in the pile on the north side of the house?' and he said, 'No, it was just by itself.' He then asked him, 'When did you get it?' He said, 'I took it in with me.' And Sergent Pauline asked him, 'Who did you kill first?' He said, 'The old lady, I guess.' I then asked him what the drag marks were in blood from the bathroom. He stated he didn't know, that he was blank. And Sergeant Pauline then asked him when it happened. He said, 'Sometime in the last two days.' He asked him how he killed his sister, and he said, 'I don't know. I must have blacked out.' Q. Was there anything more said? A. No, sir. At this time he said nothing further."

After petitioner was arrested he was placed in the interrogation room at the police station. There Officers Morrison and Kohls elicited from him a detailed account of events leading up to the murders, of the murders themselves, and of events following the murders.[5] In the course of this second statement petitioner with chilling aplomb discussed his reasons (or rather lack of reasons) for the killings; admitted that he had planned the killings before he executed them; reviewed plans that he had considered and rejected for disposing of the bodies; described his emotions as he was carrying out the killings; expressed his lack of remorse at the time of the statement; and explained that he had taken no narcotics during the period of the crimes.[6]

Petitioner testified at the trial in his own behalf, claiming that he was under the influence of narcotics (a combination of barbituate and benzedrine) when he performed the acts with which he was charged. He stated that such acts had been unplanned and had been triggered by a remark of his mother to the effect that he would go back to jail if he continued to use narcotics. He testified further that he had lied to Officers Morrison and Kohls on this point during the second extrajudicial statement ''Because at that time I realized what I had done and I, too, wanted to die,'' and that several other damaging statements made by him at that time were untrue and were said ''because I wanted everyone to believe that I was a cold blooded killer and have me executed.'' In general, petitioner's courtroom testimony lacked the matter-of-fact descriptive character of his second extrajudicial statement; rather it was marked by hazy recollections and equivocations. Serious doubt was cast upon petitioner's story by cross-examination and subsequent evidence in rebuttal.

It appears that petitioner was not advised of his constitutional rights to counsel and to remain silent prior to either of the extrajudicial statements admitted against him. The Attorney General contends that the first extrajudicial statement

---

[5]This statement was tape recorded for use at trial. The tape was played to the jury and was of some 35 minutes' duration. A transcript of the recording was also read to the jury by Officer Morrison; this reading occupied some 30 pages of reporter's transcript.

[6]''M. [Officer Morrison] You hadn't been dropping any pills, drinking anything, no marijuana—nothing—any hard stuff? You ever chippie with hard stuff [addictive narcotics]? S. [Suspect Morse] Huh? M. You ever chippie with hard stuff? S. [Nodded affirmatively.] M. But you weren't messing with any that night? S. No. If I thought it would make a difference in court I'd say I was strung out or something. There ain't [obscenity] going to help this time.''

was nevertheless admissible because petitioner was not in custody and the investigation had not reached the accusatory stage when the statement was given. He concedes that the second extrajudicial statement was erroneously admitted but urges that it was simply cumulative of the first statement and that its admission therefore did not prejudice petitioner.

We need not consider whether petitioner's first extrajudicial statement was obtained in violation of his constitutional rights for it appears that, even if we assume the first statement to have been admissible, the reception of the second extrajudicial statement (which the Attorney General concedes to have been error) was prejudicial and requires that the judgment be reversed insofar as it convicts petitioner of the two murders.

The Attorney General's contention, that the erroneous admission of petitioner's second extrajudicial statement was nonprejudicial because it was merely cumulative of the first statement, is based upon *People* v. *Jacobson* (1965) 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555], and subsequent cases applying the rationale of that decision. In *Jacobson* defendant made a series of extrajudicial statements, all of which were admitted against him at trial, to the effect that he had killed the daughter of his common law wife. The last two of these statements were obtained in violation of defendant's constitutional rights to have counsel and to remain silent. We concluded that, although the statements in question were clearly "confessions" rather than "admissions," and that the rule of automatic reversal (see *People* v. *Dorado, supra,* 62 Cal.2d 338, 356) would normally be applicable, the peculiar circumstances there at bench required an inquiry into "the impact, if any, of the confession on the verdict. . . ." (63 Cal.2d at p. 330.) That inquiry resulted in a determination that no prejudice to defendant resulted from the erroneous admission of the final two statements. "No undue emphasis was placed on any of the confessions at the guilt phase. Each person who had witnessed defendant make an incriminating statement testified to what he had heard. No one confession contained detail significantly different from the others. The two improperly obtained statements were therefore merely cumulative. Moreover, the sequence of the confessions here, where the improper statements were the last obtained, can give rise to no implication that the legally obtained confessions were 'induced' by those subsequently improperly obtained.

"The jury's task was simply to determine whether defend-

ant spoke the truth on the day Kelly Babcock [the alleged victim] died or on the witness stand. There were approximately 10 separate admissions or confessions made by defendant, . . . It is not plausible, having reviewed this record, to conclude that 10 statements were sufficiently more persuasive than only eight and that the elimination of two would have altered the outcome.'' (Fn. omitted.) (63 Cal.2d at pp. 330-331.)

Similarly, in *People* v. *Cotter* (1965) 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862], vacated on another ground in *Cotter* v. *California* (1967) 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035], the defendant gave a series of seven statements implicating himself in the murder of the alleged victim. The last three of these statements were obtained in violation of *Escobedo-Dorado* principles but were admitted against the defendant along with the four statements which had been properly obtained. We held the error nonprejudicial. ''A comparison of the seven statements made by the defendant indicates that the final statement, the seventh, although adding certain details, was essentially a composite of the first four statements, all of which were given by defendant prior to his being questioned at the police station. The various statements did not contradict one another in any substantial degree and none of the details added by the seventh could have had any material effect on the outcome of the trial.'' (63 Cal.2d at p. 392.)

In *People* v. *Powell* (1967) 67 Cal.2d 32 [59 Cal.Rptr. 817, 429 P.2d 137], however, we recently had occasion to examine the limits of the *Jacobson* rationale. There each of the two defendants involved gave an exculpatory statement shortly after his apprehension and under conditions rendering such statements admissible under *Escobedo-Dorado* standards. In the several days following, however, after the defendants had been arrested, each was subjected to intensive interrogation which resulted in multiple statements from each ''admitt[ing] an increasing degree of involvement'' in the crimes charged. (67 Cal.2d at p. 54.) In the course of these statements, which were obtained in violation of *Escobedo-Dorado* requirements, each defendant admitted active participation in the murders at issue. Moreover, the subsequent statements, unlike the earlier ones, contained evidence of premeditation, deliberation, and motive. We held that these factors forbade an application of the *Jacobson* rationale.[7] ''Contrary to *Jacob-*

---

[7] After considering the statements as ''confessions,'' and determining

*son* and *Cotter*, accordingly, here the subsequent statements did add 'significantly different' details to the first and supplied a number of missing 'essentials of the crime.' The statements in this case did 'contradict each other'; in fact, each defendant admitted in several later statements that he had lied in earlier ones. Such an array of progressively incriminating statements cannot be deemed 'merely cumulative.' " (67 Cal.2d at p. 54.)

We are persuaded that the facts of the instant case, like those of the *Powell* case, do not permit an application of the *Jacobson* exception to the rule of automatic reversal in cases involving the erroneous admission of confessions obtained in violation of the Fifth, Sixth, and Fourteenth Amendments. It is manifest that the second confession served to amplify in minute detail the stark outlines provided in the first confession. But amplification was only the least of its effects. Whereas the first statement expressed uncertainty as to the time of the killings and the manner in which they were carried out, and attributed this uncertainty to a "blackout" of some kind, the second statement described with dispassionate particularity the background and execution of the crimes and exposed them as a coldly calculated expression of accumulated rage. Moreover, in the course of its exposition the second statement disclaimed the presence of the very factor which had been hinted at in the first statement and which later formed the core of the defense, to wit, the possibility that petitioner had committed the crimes while intoxicated by narcotics. For these reasons we conclude that the *Jacobson* exception to the rule of per se prejudice cannot be applied to this case and that the erroneous admission of petitioner's second extrajudicial confession requires that the judgment be vacated insofar as it convicts him of the murders of his mother and sister.[8]

---

that they did not fall within the *Jacobson* exception to the per se reversal rule, we went on in *Powell* to consider their prejudicial effect if they were considered mere "admissions." (See *People* v. *Hillery* (1965) 62 Cal.2d 692, 712-713 [44 Cal.Rptr. 30, 401 P.2d 382].) Since it is undisputed that petitioner's second extrajudicial statement constituted a full confession, we do not here consider the indicated facet of the *Powell* case.

[8]At oral argument the Attorney General for the first time advanced the claim that the prejudicial effect of the erroneous admission of the second extrajudicial confession was ameliorated by petitioner's subsequent courtroom testimony. (See *People v. Spencer* (1967) 66 Cal.2d 158, 163-169 [57 Cal.Rptr. 163, 424 P.2d 715]; cf. *People* v. *Alesi* (1967) 67 Cal.2d 856, 862-863 [64 Cal.Rptr. 104, 434 P.2d 360].) This argument is utterly devoid of merit. As we point out in greater detail in *People* v.

We note that in the event of retrial questions of the admissibility of petitioner's extrajudicial statements, insofar as the constitutional validity of such statements comes into issue, will be governed by the standards set forth by the United States Supreme Court in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. (*People* v. *Doherty* (1967) 67 Cal.2d 9 [59 Cal.Rptr. 857, 429 P.2d 177].) Because we do not reject the possibility that the prosecution, upon retrial, may produce additional evidence relevant to an examination of petitioner's statements under *Miranda* standards, we do not here undertake an application of such standards to the instant record. (Cf. *People* v. *Arnold* (1967) 66 Cal.2d 438, 449 [58 Cal.Rptr. 115, 426 P.2d 515]; *People* v. *Charles* (1967) 66 Cal.2d 330, 339-342 [57 Cal.Rptr. 745, 425 P.2d 545]; see also *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].)

Finally, we reject petitioner's contention that, instead of vacating the murder convictions, we should reduce them to second degree. Even assuming that this court, upon an application for habeas corpus, possesses the power to grant the indicated relief in a proper case,[9] and further assuming that upon retrial both petitioner's extrajudicial statements and his courtroom testimony in the first trial would be inadmissible against him, "we do not feel constrained to hold that the [remaining] evidence is legally inadequate to support a verdict of murder of the first degree." (*People* v. *Thomas* (1945) 25 Cal.2d 880, 905 [156 P.2d 7]; cf. *People* v. *Hillery, supra,* 62 Cal.2d 692, 703-704.)

The writ is granted. The remittitur in *People* v. *Morse,* Crim. 7339, is recalled and the judgment of conviction is reversed in its entirety as to counts 1 and 2. Petitioner is remanded to the custody of the Superior Court of San Diego County for a new trial on such counts.

Traynor, C. J., Peters, J., Tobriner, J., and Burke, J., concurred.

*Morse, post* at pages 711-748 [76 Cal.Rptr. 391, 452 P.2d 607], there is at least "a 'reasonable possibility' that the defendant took the stand in part because a confession which he erroneously believed admissible had completely demolished his prospects for a favorable verdict." (Fn. omitted.) (*People* v. *Spencer, supra,* 66 Cal.2d 158, 169.) In the face of such a possibility we cannot conclude that the testimony given by defendant on the stand rendered harmless the underlying violation of *Escobedo* and *Dorado.*

[9]Section 1260 of the Penal Code provides in substance that such relief may be granted *on appeal from the judgment.*

McCOMB, J.—I dissent. In my opinion there is no prejudicial error in the record. I would affirm the judgment under article VI, section 13, of the California Constitution.