[Crim. No. 3776. Fourth Dist., Div. One. May 19, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
DELBERT EUGENE DAVANEY, Defendant and Appellant.

## Counsel

Jones, Baxley, Crouch & McCarty and Robert C. Baxley for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jimmie E. Tinsley, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**WHELAN, J.**—Delbert Eugene Davaney appeals from a judgment of conviction of first degree robbery (Pen. Code, § 211) in a non-jury trial.

### STATEMENT OF FACTS

At approximately 8:20 p.m., Davaney, on October 16, 1968, entered a liquor store in San Diego where Marvin Rosen was working as a clerk, approached Rosen, standing behind the cash register counter, raised a shotgun he carried to a level position about waist-high, and said, "Don't do anything."

A customer named "Red" was in the store when Davaney entered. Red started to leave the store but stopped when Davaney pointed the gun at him and said, "Don't move."

Davaney was near the cash register counter and again pointed the gun at Rosen, demanding the money in the register.

Roger Clarkson, another clerk, from the rear of the store, heard a rather loud voice and walked into the store area to see what was going on. He saw a man with a gun pointed at Rosen and heard him demanding money from Rosen. The man turned toward Clarkson for a second and Clarkson returned to the back area of the store and remained there until the man left. Clarkson was unable to say that Davaney was the man he had seen in the store.

Rosen withdrew an undetermined number of one-dollar and five-dollar bills from the register and placed them on the counter. Davaney picked up the money, placed it in one of his pockets, and left, saying, "Don't move or you are dead." Rosen immediately telephoned the police while Red followed Davaney out the door and saw him get into a car. Red got the license number and gave it to Rosen, who relayed the number to the police.

Rosen testified that during the holdup Davaney's speech was slightly slurred and his facial expression was blank. Rosen was not able to smell alcohol about Davaney and, because Davaney remained four to five feet away from him at all times, would not have been able to detect an odor unless it had been very strong. Clarkson also said Davaney's voice was not clearly distinct but he could determine what he was saying.

At 8:20 p.m. Officers Clain and Jacobs of the San Diego Police Department received a report of the robbery and were given the license number,

which was found to belong to a 1963 Chevrolet registered to Blanche Davaney of 6359 Scimitar Street.

Clain and Jacobs arrived at the Scimitar address at about 9:15 p.m. and observed two cars: a 1963 Chevrolet, bearing the license number given them, parked under a carport; and a 1957 Chevrolet, parked nearby. The hood of the 1963 Chevrolet was warm. In the 1957 Chevrolet, whose doors were locked, a shotgun was lying on the back seat.

Officer Ringkamp also arrived at the Scimitar address. At the residence Davaney's mother gave the police a key to the 1957 Chevrolet. The shotgun was removed and was found to be unloaded. No shells were found in either vehicle.

The mother told Ringkamp she thought her son might be at the Encanto recreation center, which was a few blocks away. At the recreation center Ringkamp observed a man sitting on the floor whose appearance matched the description he had received over the radio. Ringkamp approached and said, "Davaney?" The man replied, "Yes." Ringkamp gave him the *Miranda* warning and placed him under arrest for the robbery. Ringkamp testified: "I asked him if he understood the questions intelligently, and he said 'Yes.' And then I asked him if having understood what I had told him, was he willing to talk with us; and he said, no, he didn't want to talk. He said he wanted to talk to a lawyer." Ringkamp nevertheless asked Davaney if he had used his mother's car that night and if he owned a gun. Davaney replied "no" to both questions.

At the time of the arrest, Ringkamp did not notice an odor of alcohol about Davaney. He did notice, however, that Davaney spoke very slowly and did not appear to be nervous. Ringkamp, during the trip to the police station, asked Davaney if he had been in the Lomita Village area that night. Davaney said he had not.

Officer James Sing had known Davaney casually for some time prior to the incident and was assigned to do the follow-up in the case. At approximately 11:30 the following morning he saw Davaney in the jail's interrogation room. Sing gave Davaney the *Miranda* warning which Davaney said he understood. Sing was unaware that Davaney had requested to see an attorney the previous night and asked if he was willing to talk. Davaney replied that he would answer some questions. No attorney was present. During the interrogation a full confession was obtained, the content of which was admitted at trial over objection.

The nature of the defense was diminished capacity.

Davaney's mother stated he had drunk increasing amounts of alcohol

in the past few years and had been drinking daily from October 11, 1968, until October 16, the day of the robbery. On October 16 she came home from work about 5 p.m. and found Davaney asleep. He awoke around 7 p.m. and demanded dinner. When he found the food was cold, Davaney became loud and abusive and began knocking over furniture. Someone called the police and, upon their arrival, Davaney told them he had been drinking vodka and that was all he had been taking; the police shined a flashlight into defendant's eyes; after the police left she fixed defendant a sandwich, he went outside, and pretty soon she heard her car starting.

Sophia Boniface, a family friend, testified that she knew Devaney had been a heavy drinker "for the last six months." She had last been in touch with him on October 11 when she had spoken to him over the telephone, and he seemed very drunk.

Officer Strey, a defense witness, who had been at the Davaney home shortly after Davaney's argument with his mother, testified he had observed overturned furniture. Strey was able to smell a stale odor of alcohol about Davaney and said he appeared "half drunk" but not "stone drunk." "He would or could understand what we were saying to him, and he could talk about to us. He answered our questions. He was crotchety. He was not violent. And so checking him further, we checked his eyes to see whether his eyes were dilated, the pupils were dilated or pinpointed. This wasn't so. So we felt in our minds that it was just plain alcohol." Strey testified that defendant's condition was not such that the officer would have arrested him in a public place; "He wasn't staggering when I came into the room. His speech was coherent enough where I could understand him very well. He wasn't slurring his words . . ."; defendant's eyes were not dilated but appeared normal.

As a witness defendant testified he was 20 years of age, had graduated from high school in 1966, had been unemployed for about six months prior to January 19, 1969; that he had been drinking during the period around October 16, 1968, had started drinking on October 11, was "drinking beer, whiskey mostly. Beer and whiskey" and taking "rainbow" pills, and drank until Wednesday (October 16); that on Wednesday night he got into an argument with his mother about something; that he got a shotgun from his mother's closet and lowered it out of his bedroom window, then went around and got the gun, did not put any shells in it, got in his mother's car and left; pulled inside a driveway by a service station and stopped, told a man at the liquor store to give him the money; that he was wearing slacks and put the money in the pocket of the slacks; that he saw another man in the liquor store by the door, told that man, "Don't go out"; the liquor store was about three miles from his home; he had

been in it about 15 times previously, had not bought liquor there, had not seen Rosen before; in driving home he went through Skyline Hills; at home he put the shotgun in the back seat of his own car, put some of the money a little way off from his car in a sloping area going down toward a canyon, put some more money in another spot farther along, whose location he did not remember, walked down to the recreation center, where the police found him; later he found $30 he had hidden and gave it to his mother; he had been drinking the "full day" and had earlier that day "dropped a couple of pills," did not do any drinking after the robbery; he did not know why he had robbed the liquor store, did not need the money, and when he went to the liquor store he had a couple dollars on his person; he remembered talking to Sing at the police station; he remembered he had traveled east on Imperial Avenue to 65th Street and made a right turn there to return home, remembered two policemen had come to the house before the robbery and talked to him about his having turned over the furniture; in answer to questions by the court he said he drank mostly beer, also drank half pints of Barcardi; a half pint would last about half an hour; he did not know how long it had gone on.

Dr. M. Brent Campbell, a psychiatrist, testified he had examined Davaney on five occasions since the robbery, most recently on January 14; and on November 18 he was attempting to determine whether defendant "had a mental disorder and whether or not it had affected his ability to formulate a specific intent to steal"; it was the doctor's opinion defendant was not responsible for his actions during the robbery and could not "conform to right and wrong," and at the time of the robbery could not "formulate the intent to perform a robbery or perform a felonious act"; he definitely felt defendant "was under the influence of a drug or alcohol to the point that his ability to know right from wrong was diminished, as well as his ability to follow the right from wrong were diminished"; although defendant "might impulsively want to do something" it would be doubtful he would "commit a robbery which is contrary to his basic nature"; the doctor had been informed by defendant that he had taken some rainbows or a rainbow and had been drinking earlier on the day of the robbery, but had not been informed how much alcoholic beverage defendant had consumed, or what type, on that day or on any of the three preceding days; although defendant had not been drinking recently he was still an alcoholic; an alcoholic remains an alcoholic whether or not he has recently had any alcoholic beverage; although Davaney claimed to have had some sort of seizure some time after the robbery, there was no previous history; and an electroencephalogram did not indicate the presence of epilepsy.

## CONTENTIONS ON APPEAL

Davaney raises the following contentions on appeal:

1. The admission, over objection, of Officer Sing's testimony regarding Davaney's confession constitutes reversible error.

2. The evidence was insufficient to support a finding that Davaney possessed the mental capacity to formulate a specific intent to steal.

## FIRST CONTENTION

Davaney argues the admission of testimony concerning his confession is reversible error, since he had asserted his right to remain silent, and prior to Officer Sing's interrogation had displayed no predisposition to waive that right.

The holding in *People* v. *Ireland,* 70 Cal.2d 522 [75 Cal.Rptr. 788, 450 P.2d 580], and more compellingly that of *People* v. *Randall,* 1 Cal.3d 948, 958 [83 Cal.Rptr. 658, 464 P.2d 114], both decided after the trial of the case at bench, make inadmissible a confession obtained under the circumstances leading up to defendant's confession. Its admission was error. The sole question is whether that error requires reversal.

Absent a testimonial or legally obtained pretrial confession, the general rule has been stated thus: The introduction in evidence of a confession obtained from the defendant in violation of constitutional guarantees is prejudicial per se and compels reversal regardless of other evidence of guilt. (*Jackson* v. *Denno,* 378 U.S. 368 [12 L.Ed.2d 908, 84 S. Ct. 1774, 1 A.L.R.3d 1205]; *Rogers* v. *Richmond,* 365 U.S. 534 [5 L.Ed.2d 760, 81 S.Ct. 735]; *Payne* v. *State of Arkansas,* 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844]; *People* v. *Rollins,* 65 Cal.2d 681, 692-693 [56 Cal.Rptr. 293, 423 P.2d 221]; *People* v. *Schader,* 62 Cal.2d 716, 728-731 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Dorado,* 62 Cal.2d 338, 356 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Powell,* 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137]; and cases cited.)

In passing upon the question whether the error compels reversal, we may not weigh the other evidence of guilt that came from the prosecution witnesses. Since defendant also was a witness, we may consider his testimony if his becoming a witness was not itself a result of the introduction into evidence of the illegally obtained confession, and if, after a review of the entire record, we are satisfied beyond a reasonable doubt that the result would not have been more favorable to Davaney if the pretrial confession had been excluded.

The problem was considered in *People* v. *Smith,* 63 Cal.2d 779, 803

[48 Cal.Rptr. 382, 409 P.2d 222], where the court said: "[W]hen Mrs. Walker testified, the only substantial evidence that had been introduced connecting her with the conspiracy was the reading of her statement of February 1 to the jury and the playing of the tape-recording of that same statement. Her testimony was therefore 'impelled by the erroneous admission of that evidence and cannot be segregated therefrom to sustain the judgment.'"

In *People* v. *Davis,* 62 Cal.2d 791, 797 [44 Cal.Rptr. 454, 402 P.2d 142], the court had said: "Even if we assume that in some cases a testimonial confession can make harmless the erroneous admission of an extrajudicial confession, defendant's testimony in this case did not do so."

In *People* v. *Clark,* 62 Cal.2d 870, 881 [44 Cal.Rptr. 784, 402 P.2d 856], the court had said: "This prejudice was not cured by both defendants later taking the stand and testifying to the same facts. This is so because here the prosecution rested after having produced no substantial evidence against either Coulverson or Davis, except that contained in the improperly obtained extrajudicial statements."

More recently, the California Supreme Court has said in *People* v. *Quicke,* 71 Cal.2d 502, 518 [75 Cal.Rptr. 683, 455 P.2d 787]: "We have further determined that the admission of the improperly obtained second and third extrajudicial confessions did not *induce* the testimonial confession. Exclusive of the second and third confessions, defendant was confronted with his own first, and admissible, confession, which established his guilt. We may properly conclude that there is no reasonable possibility that defendant would have elected not to take the stand and confess if he had been confronted with only the first extrajudicial confession and not the second and third ones. Since we have held that the first covered the substance of the second and third confessions, we cannot see how the introduction of the latter could possibly have induced defendant to take the stand."

The rule as stated in *Harrison* v. *United States,* 392 U.S. 219 [20 L.Ed.2d 1047, 88 S.Ct. 2008, 2011], is this: "The remaining question is whether petitioner's trial testimony was in fact impelled by the prosecution's wrongful use of his illegally obtained confessions. It is, of course, difficult to unravel the many considerations that might have led the petitioner to take the witness stand at his former trial. But, having illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used. 'The springs of conduct are

subtle and varied,' Mr. Justice Cardozo once observed. 'One who meddles with them must not insist upon too nice a measure of proof that the spring which he released was effective to the exclusion of all others.' Having 'released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony."

Under *Chapman* v. *State of California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], unless we can declare our belief beyond a reasonable doubt that the error was harmless, we must reverse. In the circumstances we must be convinced beyond a reasonable doubt that the illegal confession did not bring about the testimonial confession.

What is required is that the prosecution must show that defendant had an independent motive for testifying in order to satisfy the requirement that the chain of causation between extrajudicial confession and testimonial confession be broken. (*People* v. *Spencer,* 66 Cal.2d 158, 168 [57 Cal. Rptr. 163, 424 P.2d 715]; *People* v. *Wright,* 273 Cal.App.2d 325, 339-340 [78 Cal.Rptr. 75].)

█ The evidence in the record is convincing that it had been decided before the extrajudicial confession was admitted that Davaney would testify, and that in testifying Davaney was carrying out that intention as a part of a calculated plan of defense.

We have recited the testimonial confession by defendant covering the objective elements of the robbery.[1]

---

[1]Sing's full testimony as to defendant's statements to him follows: "My first question to him was: 'Did you borrow your mother's car last night?'

"And he replied, 'Yeah. Normally she doesn't let me use it but we had a fight and while she was on the phone, I took the car.' And then I asked him, 'Where did you go with the car?' And he replied to me, 'Well, it should be clear. I took the car and went and robbed a liquor store.' And then I asked him, 'How did you go about it?' And he said, 'It was simple. I took my dad's shotgun and I just walked into the place and said, "Give me all your money" or something like that. I don't really remember what I said.' Then I asked him, 'How much money did you get and what did you do with it?' He replied, 'I don't know. I didn't count it. I just jammed it into my pocket and walked off, and drove home. When I got home I remember that it was cold, so I put on a sweater and I walked down the path to the Recreation Center. I went to the park and drank a soda pop. Then I went and watched them play basketball in the gymnasium. That's where the police caught me.'

"I then asked him, 'Where is the money?' And he replied, 'I don't know. I think I hid it in the car, but I can't remember for sure. I know I only had a couple of dollars when I was arrested.'

"I then asked him, 'How did you get the shotgun out of the house past your mother?' And he said, 'That was simple. I just put the gun out the window.' Then I asked him, 'Was the shotgun loaded when you committed the robbery?' and he replied, 'I don't know. I have shells for it, but I don't remember if it was loaded.' I

The trial of the case had begun on January 16, 1969, at 2:05 p.m. At 4:23 p.m. of that day court adjourned. Officer Sing, who testified as to the confession, was the last witness.

Court opened on January 17 at 10:37 a.m. Without calling any witness the district attorney stated the People's case rested and counsel for Davaney made this opening statement: ". . . I would like to make a brief opening statement for the purposes ,perhaps of virtually narrowing the issues in this matter insofar as the defendant is concerned.

"You have heard the prosecution's evidence, a great deal of which we do not take issue with. It was patently clear from the evidence that Mr. Davaney, the defendant, did in fact, with a shotgun, go into the Lomita Liquor store, and point the shotgun at an individual—at an individual in the liquor store. That he demanded or was given money. And, that he then went out of the liquor store, and put the gun on the back seat of this car, and went on to a place called the Encanto Recreational Hall.

"The reason we did not stipulate to the evidence as such is that, as part of our case, we intend to show that this type of a robbery is of such a bizarre nature that it tends to lend itself to our position. And our defense will be that of diminished responsibility or diminished capacity as it is now known."

He then stated what the supporting evidence would be and the names of the witnesses, the fourth of whom was to be defendant, who would "testify that he went to the liquor store, and that he did in fact do what the officers and Mr. Rosen said that he did: Hold up the liquor store, but

then asked him, 'What did you do with the gun when you got home?' And he said, 'I put it in the back seat of my car.' Then he said, 'I don't know why I did this. It was a stupid thing. I know I'll have to pay for it. The police came to the house earlier when my mother and I had a fight.'

"Then I asked him, 'When you walked out of the store, did you see anyone follow you?' And he said, 'I don't remember. I don't even think I watched. I just went out and got in the car, and drove down the street through Lomita Village, down toward the Morse High School. By the old Speedee Market, I turned south and went down Imperial. I turned left on Imperial and went down to 65th. I turned right on 65th and drove up the hill to my house.'

"Then I asked him, 'How many people did you see in the store?' And he replied, 'I think there were three men. One of them tried to leave and I made him get against the wall.' Then I asked him, 'Why is it so hard for you to remember where the money is, yet you know all of the details of the robbery?' And he said, 'Man, I've been high since Sunday, my birthday.' And I asked him, 'High on what?' And he said, 'Whiskey, what do you think? If it was pills I wouldn't tell you.'

"Then I asked him, 'What clothes were you wearing during the robbery?' And he said, 'I think I was wearing the ones I have on now.' Then I asked him, 'Were you drinking before or after the robbery?' And he replied to me, 'I had some whiskey afterwards in the park.' "

that he has some vague recollection of some of the parts of it while of other parts of it, he recalls very well what took place."

Dr. Campbell was mentioned as the last witness, who would, counsel anticipated, testify that afternoon.

In his argument to the court, counsel for defendant stated: "As I said at the outset of this case, we do not state that Mr. Davaney did not commit this crime. I don't think that there is any doubt, and we have an identification by Mr. Rosen. We have a gun found in the back of his automobile. We have his admissions to Mr. Sing. I think that it is a pretty foregone conclusion that we have to accept the fact that Delbert Davaney did commit this robbery in the liquor store.

"But as I said in my opening statement, the question is: With what state of mind did he commit this robbery?"

From those circumstances, the long-prepared background to the testimony of Dr. Campbell, and the nature of the defense which implies an admission of the objective elements of the crime, we declare our belief that beyond a reasonable doubt Davaney would have testified even if the extrajudicial confession had not been admitted.

To what extent the admission of the extrajudicial confession may have entered into the court's implied finding that Davaney was capable of forming and did form the requisite intent permanently to deprive the owner of his property we discuss in treating of the second appellate contention.

## SECOND CONTENTION

We should also consider the relationship of the admission of the illegally obtained confession to the defense of lack of capacity to form a specific intent.

*In re Morse,* 70 Cal.2d 702, 709 [76 Cal.Rptr. 385, 452 P.2d 601], was a case in which it was urged that the first of the two statements made by the defendant was admissible, although the second admittedly was not. It was urged further that since the first was admissible, the admission of the second did not require reversal. In disposing of that contention, the court said: "Whereas the first statement expressed uncertainty as to the time of the killings and the manner in which they were carried out, and attributed this uncertainty to a 'blackout' of some kind, the second statement described with dispassionate particularity the background and execution of the crimes and exposed them as a coldly calculated expression of accumulated rage. Moreover, in the course of its exposition the second statement disclaimed the presence of the very factor which had been hinted

at in the first statement and which later formed the core of the defense, to wit, the possibility that petitioner had committed the crimes while intoxicated by narcotics."

The statements in *Morse, supra,* were both extrajudicial statements. Here, one statement was extrajudicial and one testimonial.

The pretrial confession gives support to an implied finding that Davaney had the capacity to form and did form the necessary specific intent. However, the testimony of defendant gives evidence of planning and intent, of consciousness as to what was being done, of motor control in carrying out the plan, and of memory of a considerable amount of the detail.

A close comparison of the testimony of Davaney with the pretrial confession discovers little or no substantial difference between them in their possible bearing on defendant's mental capacity to form an intent. His testimony gave a more extensive history of his activities before he left home to go to the liquor store. In only a few matters were there inconsistencies. Sing was not told Davaney had taken any pills, but was told Davaney would not let Sing know if he had taken pills. Another inconsistency appears in Davaney's inability to remember where he had put the money, as stated to Sing, and his recollection on that subject in testifying.

In the statement to Sing, the following matters touched upon in Davaney's testimony were not mentioned: consumption of beer; taking of pills; that the window from which the shotgun was lowered was his bedroom window; Davaney's going around later to get the gun; his saying to a second man at the liquor store, "Don't go out."

In his testimony Davaney omitted mention of these matters adverted to in the pretrial confession: that there was a third man in the liquor store; that he had a drink of liquor after the robbery; that he had put on a sweater after his return home.

In testifying, he mentioned something that happened after his confession to Sing, the retrieving of part of the stolen money and giving it to his mother.

In both statements he said he did not know why he had committed the robbery.

To Sing he said he had been "high" since his birthday on the Sunday before the Wednesday of the robbery.

The confession contained nothing that could be used to negate the specific matters testified to by defendant that might have been relied upon by defendant to support his claim of diminished capacity.

The prosecution sustained the burden of proving beyond a reasonable doubt that Davaney went through the gestures of committing a robbery with the specific intent of depriving the man from whom he took the money permanently of its possession.

The testimony of the defense witnesses, taken together, fails to cast a reasonable doubt as a matter of law on Davaney's possession of and ability to form that intent.

The only psychiatric testimony came from the defense.

The question whether Davaney possessed the necessary mental capacity to form a specific intent to deprive the owner of his property permanently remains a factual one. (*People* v. *Moore,* 257 Cal.App.2d 740, 747 [65 Cal.Rptr. 450].)

█ Even though the trier of fact may receive the benefit of the physician's expert knowledge relative to the question of capacity in the form of testimony as to the ultimate fact (*People* v. *Brown,* 49 Cal.2d 577, 587 [320 P.2d 5]), the expert remains only a witness, to whose opinion the trier of fact need give no more acceptance than is compelled by the reasons upon which it is based. (*People* v. *Bassett,* 69 Cal.2d 122, 144 [70 Cal.Rptr. 193, 443 P.2d 777].)

█ Dr. Campbell's opinion had these ingredients: He believed it was out of character for Davaney to have done what he did; Davaney was an alcoholic and therein was the explanation of his out-of-character conduct. However, the witness did not know what kind of alcoholic beverage or how much Davaney had consumed before going to the liquor store, or in the three days preceding.

█ There is an area in which psychiatric testimony uncontradicted by other psychiatric testimony should be given greater weight than in others, that is, where the question is as to a defendant's "ability to maturely and meaningfully reflect upon the gravity of his contemplated act." (*People* v. *Nicolaus,* 65 Cal.2d 866, 878 [56 Cal.Rptr. 635, 423 P.2d 787].)

On the same subject, the court said in *People* v. *Goedecke,* 65 Cal.2d 850, 857 [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213]: "[A]lthough there was a direct conflict with respect to defendant's ability to form an intent to kill and to premeditate the killing, two psychiatrists saying that he had that ability and the remaining two taking the contrary view, there was no psychiatric testimony as to the *extent* to which defendant could *maturely* and *meaningfully reflect* upon the gravity of his contemplated act. In other words, even though we assume, as we must, that the trier of fact determined that defendant did have the mental capacity at the time to form the intent to kill, this conclusion does not foreclose our inquiry in a per-

plexing murder of the kind here present as to whether the evidence was sufficient to find defendant guilty of murder of the first degree."

In *People* v. *Ford,* 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132], the defendant was found by the Supreme Court to have lacked that capacity for reasoned premeditation to be guilty of murder in the first degree. There had been an earlier appeal (*People* v. *Ford,* 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892]) following a first trial in which Ford had been found guilty of murder and robbery committed earlier on the day of the murder. The same psychiatric expert testified in both trials as to the defendant's emotional and psychiatric background, including a habit of excessive drinking. The chief element missing when the robbery was committed was acute intoxication existing when the murder was committed.

Part of the basis for the psychiatric opinion that Ford lacked the necessary capacity at the time of the murder was that three and one-half hours thereafter a chemical analysis showed Ford's blood-alcohol content was 1.7 milligrams per milliliter, which to the expert indicated a content at the time of the murder of 2.08 to 2.22 milligrams per milliliter. (*People* v. *Ford, supra,* 60 Cal.2d 772, 789.)

In the case at bench the strongest evidence as to the defendant's condition is that of the witnesses who observed him both before and after the robbery. As the court observed in *People* v. *Ford, supra,* 60 Cal.2d 772, 793: "Roope's [the victim's] testimony as to the circumstances of the robbery, believed by the jury, permits of no other interpretation than that defendant entertained a specific intent to steal when he demanded Roope's money at gunpoint."

Here, too, the evidence is clear and sufficient that Davaney had the mental capacity to form and did form the necessary intent.

After a review of the entire record, we declare our belief that beyond a reasonable doubt the result of the trial would not have been more favorable to defendant if the pretrial confession had been excluded.

That being so, the error in receiving the confession does not compel reversal.

The judgment is affirmed.

Coughlin, Acting P. J., and Ault, J., concurred.