Filed 7/15/16  P. v. Gholipour CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GOLNAZ GHOLIPOUR,<br><br>    Defendant and Appellant. | D067177, D068234<br><br>(Super. Ct. No. SCD246831)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 29, 2016, be modified as follows:

1.  On page 2, first sentence of the first full paragraph, the word "three" is changed to "four" and the word "seven" is changed to "eight" so the sentence reads:

> A jury convicted Golnaz Gholipour of four counts of making false or fraudulent statements regarding her physical and emotional condition in a deposition and to an evaluating physician for the purpose of obtaining workers' compensation benefits (Ins. Code, § 1871.4, subd. (a)(1); counts 1-3, 13) and eight counts of perjury in a deposition (Pen. Code,[1] § 118, subd. (a), counts 4-10, 12).[2]

Footnotes 1 and 2 in the sentence above remain unchanged.

2.  On page 38, first sentence of the second full paragraph, the words "also in July" are changed to "on May 7," so the sentence reads:

Gholipour was convicted of three counts (counts 1-3) of making false and fraudulent statements misrepresenting her condition at her deposition in July 2012 and one count of making a false and fraudulent statement, on May 7, 2012, to misrepresent her condition to a physician (count 13) for purposes of obtaining workers' compensation in violation of Insurance Code section 1871.4, subdivision (a).

3. On page 39, first full sentence, the word "July" is changed to "May 7," so the sentence reads:

The portion of the restitution award attributable to conduct prior to May 7, 2012 must be stricken.

4. On page 39, first sentence of the disposition, the word "July" is changed to "May 7," so the sentence reads:

We reverse the portion of the restitution order awarding restitution for conduct prior to May 7, 2012.

This modification changes the judgment.

Respondent's petition for rehearing is denied.

_____

McCONNELL, P. J.

Copies to:  All parties

Filed 6/29/16  P. v. Gholipour CA4/1 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>GOLNAZ GHOLIPOUR,<br><br>     Defendant and Appellant. | D067177, D068234<br><br><br>(Super. Ct. No. SCD246831) |

CONSOLIDATED APPEALS from a judgment and an order of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed in part, reversed in part and remanded with directions.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Kristen K. Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Golnaz Gholipour of three counts of making false or fraudulent statements regarding her physical and emotional condition in a deposition and to an evaluating physician for the purpose of obtaining workers' compensation benefits (Ins. Code, § 1871.4, subd. (a)(1); counts 1-3, 13) and seven counts of perjury in a deposition (Pen. Code,[1] § 118, subd. (a), counts 4-10, 12).[2]  The court sentenced Gholipour to a total of six years based upon a term of five years for count 1 and a consecutive one-year term for count 13.  The court split the sentence with three years to be served in local custody and three years to be served under mandatory supervision. The court imposed but stayed punishment pursuant to section 654 for counts 2 and 3 (five years each) and for counts 4 through 10 and 12 (four years each).  In a separate restitution proceeding, the court made a finding of fact Gholipour's initial claim for workers' compensation in 2007 was false and awarded restitution in the amount of $309,101.05 for all temporary disability benefits, medical costs, attorney fees and investigative costs paid and incurred on behalf of her employer since 2007.

On appeal, Gholipour contends (1) counts 5 through 10 should be consolidated because the statements involved the same "material matter" for purposes of section 118; (2) there was insufficient evidence to support the conviction for count 4, involving perjury regarding her dating or relationship status; (3) two witnesses gave improper lay

---

[1]     Further statutory references are to the Penal Code unless otherwise stated.

[2]     The jury could not reach a verdict as to count 11 for perjury.  The court subsequently granted the People's motion to dismiss this count.

2

opinion testimony; and (4) the restitution order should be vacated or modified because (a) the trial court improperly made a finding of fact in violation of Gholipour's constitutional rights to a jury determination, (b) Gholipour received ineffective assistance of counsel when her attorney failed to make federal objections on this basis, and (c) section 1202.4 does not permit a mandatory restitution award for economic losses based upon conduct for which she was not convicted. We agree section 1202.4 limits a restitution award to losses caused by the criminal conduct for which the defendant was convicted and does not permit an award based upon uncharged criminal conduct. As a result, we reverse the restitution award and remand for further proceedings to strike the portion of the award attributable to uncharged criminal conduct prior to July 2012. In all other respects, we affirm the judgment.

BACKGROUND

A

Gholipour worked as an internal medicine nurse at a Sharp Rees-Stealy (Sharp) clinic in Rancho Bernardo, California from August 21, 2006, until January 8, 2007. Gholipour saw a physician in the clinic on January 8, 2007, complaining of pain and muscle spasms on the left side of her lower back for two days. She stated she awoke in pain after a nightmare two days earlier. She reported a history of scoliosis (curvature of the spine) and episodes of back pain since she was 15 years old. The doctor signed a form for disability insurance benefits stating Gholipour's disability was not the result of her occupation.

3

Gholipour saw a physical therapist at the same clinic on January 11, 2007, and reported she felt a pop on the left side of her lumbar spine when she awoke on January 8. She said she had experienced spasms in her lower back for about a month. She also stated she had a cold with a lot of coughing. She again reported a history of low back pain.

Gholipour applied for state disability benefits on January 16, 2007.[3] She stated she stopped working due to spinal injury and muscle spasm. She was unable to walk or sit comfortably and had severe pain. She signed a statement under penalty of perjury indicating the disability was not caused by her job. Her weekly benefit allowance was determined to be $192 with a maximum benefit allowance of $4,515. Her first payment was issued on January 24, 2007. She received payments for state disability totaling $3,236.57.

On February 2, 2007, several days after her first disability payment issued, Gholipour went to see a physical medicine and rehabilitation physician. On an intake form Gholipour stated she noticed back pain on January 6 as she was getting out of bed and the injury was not work related. However, during the visit Gholipour reported a box fell on her while she was cleaning the medication room. The physician advised her to

---

[3] State disability benefits are available to individuals who do not have a workplace injury. Benefits are determined based on how long an individual has worked and how much they made in the 18 months prior to the claim. It pays up to 55 percent of the individual's normal income for 52 weeks, if that much is available in his or her account. An individual who has not worked very long in the State of California will have fewer benefits available than someone who has worked in the state longer.

report the work injury to her supervisor. The physician testified she could have had a delayed symptom onset after the injury. In the case of a disc herniation, it can take time for inflammation to build up and it is not unusual for people to first feel symptoms in the morning. However, the physician admitted if a patient received an injury one day and woke up the next morning in pain, one might think there was a connection.

Gholipour submitted a workers' compensation claim on February 12, 2007. She stated she was injured on January 5, 2007, when she tripped and a box fell on her, injuring her back. In June 2008, Gholipour submitted an application for an amended workers' compensation claim indicating she had injuries to her hips and psyche in addition to her back. Several months later she submitted another amended claim stating she had injuries to her hips, psyche, low back, left thigh, leg, left toe, and muscle atrophy. In March 2009, she submitted another amended claim indicating her trip and fall caused injury to her back, hip, psyche, upper gastrointestinal area, constipation, lower gastrointestinal area, vaginal pain, and loss of memory.

Sharp initially accepted her claim based upon the recommendation of its workers' compensation attorney, Craig Plummer. Plummer took Gholipour's deposition twice in connection with the workers' compensation claim, once in 2007 and again in 2012. At the time of the first deposition Plummer did not have Gholipour's prior records or her claim for state disability benefits.

B

Sharp's workers' compensation administrator hired an investigator in April 2012 to conduct surveillance of Gholipour's activity levels. The investigator went first to an

5

address provided to him for Gholipour, which was a single-story apartment complex. He did not find Gholipour at this location. After running an address history search, he tried another address located in Mission Viejo, a multi-story apartment complex, where he located Gholipour's vehicle in the parking lot.

On April 26, 2012, the investigator observed and filmed Gholipour emerge from the stairway of the apartment building and walk down the driveway with a male companion to the passenger door of her vehicle. They went to a shopping center where they went to a restaurant, a Walmart, a fabric store, and a consignment store before going back to the residence. She did not use an assistive device. She and her male companion held hands during the day. When they returned to the apartment complex, Gholipour ascended the steps without holding the handrail.

C

On May 7, 2012, the investigator observed Gholipour arrive at a medical office in La Jolla, California driving her vehicle. She emerged from the parked vehicle, put on a jacket, walked to the rear of the vehicle and removed a rolling walker from the trunk. She unfolded the walker, closed the trunk and then walked slowly to the entrance of the building.

Gholipour's appointment was with a physician assistant for a routine follow-up regarding her chronic pain management. Gholipour reported her low back pain and left leg pain with weakness was unchanged. She said she was able to ambulate with her new walker. She reported her pain on average was nine out of 10 on a pain scale. Objectively, she appeared to be in severe discomfort. She exhibited pain behavior such

6

as moving slowly and wincing or grimacing. She walked slowly and with a limp. She used her walker during the visit. She reported pain when her leg was lifted, suggesting nerve irritation. The physician assistant refilled Gholipour's medications and requested authorization for acupuncture visits. When Gholipour left the building, she walked slowly across the parking lot to her vehicle, folded the walker and used both hands to lift it into the trunk of the vehicle. She then walked slowly to the driver's side, entered the vehicle and drove away.

D

Several days later, around noon on May 12, 2012, the investigator observed Gholipour walk down a stairway with her male companion and into the parking lot of the apartment complex while looking at her purse. She wore jeans and high-heeled boots. They went to a restaurant and bar known as a biker hangout. They parked in a dirt parking lot and walked to the restaurant. She did not have her walker and did not appear to have difficulty walking. She held her companion's hand with one hand and swung her other arm alongside her body as they walked.

Gholipour hugged a male at the front of the restaurant. He wrapped his arms around her and swung her slightly back and forth. She showed no indication of pain. Later she and her companion greeted and hugged other individuals. She smiled at all times. During the two hours they were there, she sat on a bench at a picnic table, stood, walked around, and smiled while interacting with various people. When Gholipour and her companion left, he put his arm around her waist briefly and then they held hands. They walked across the parking area to the dirt area where they parked. She was carrying

7

a beverage as they walked. She did not appear to have any problems walking on the dirt ground with her high-heeled boots. She entered the vehicle without assistance.

After returning to the apartment for a period of time, Gholipour and her male companion left again around 4:00 p.m. with Gholipour wearing a dress and different high-heeled shoes. They went to a church, apparently for a wedding. When they emerged from the church, Gholipour was smiling and engaged in animated conversation with her companion as they walked to the parking lot. The male companion appeared to check Gholipour's makeup and touched her cheek or lips. They stopped at a Starbucks. Gholipour conversed and held hands with her companion as they walked. They then drove to a recreational center for a reception. They left the reception around 7:30 p.m. and drove back to the apartment. Gholipour walked up the stairway, slightly touching the handrail.

E

On the day of Gholipour's second deposition, July 13, 2012, the investigator observed Gholipour and her male companion walk to her vehicle. Gholipour carried a purse and a sweater. She appeared to be eating as they walked toward the vehicle. She did not use a walker or use any other assistive device.

When she arrived at the Civic Center Law Library in Santa Ana, California, she walked into the building from the car using the rolling walker. She walked slowly and guardedly with small steps and had both elbows locked as she leaned on the handles of the walker.

8

During the deposition, Plummer asked questions about Gholipour's physical abilities and restrictions. Restrictions, such as the ability to bend at the waist and the ability to sit and stand, are factored into an impairment number used to calculate the permanent disability rating. The purpose of the deposition was to elicit information to evaluate the case. The signed deposition could be used by both sides in the workers' compensation case.

Gholipour denied she had relationships with men after her divorce. She denied going out on any dates. She later changed her answer about dating to "just with friends and family."

Gholipour said she was not able to climb stairs. She later changed her deposition response to, "Not without assistance usually." She said she had climbed stairs with lots of pain. She said she needed help by holding on to someone or holding on to a railing or walls and avoided stairs.

When asked if she used the walker all the time, she stated, "All the time I need it." She changed her testimony to state, "Most of the time I need to use my walker or some kind of assistance, but on really good days I try to walk on my own." Since her surgery in May 2010, she said she needed "someone helping me or a walker or a cane." Gholipour testified she could only walk 15 minutes with a walker. She later changed her testimony from stating she could not walk any distance without the walker or assistance to saying, "Most of the time. I walked without a cane or walker a few times, but I either lost my balance or ended up having more pain. I was told by my doctor to keep using assistive devices until I was 100 percent better."

9

Gholipour initially testified the most she could stand at one time was 30 seconds to one minute with a walker. She changed her deposition testimony to state she loses her balance easily and needs some kind of assistance most of the time. She also testified she could only sit 10 to 15 minutes at a time and she had to lay down in the car on the 30-minute drive to the deposition.

She testified these restrictions on her walking, sitting and standing were the same since her surgery in May 2010. She stated her pain was constant. "I am a lot more limited now with the hardware that they placed in my back. It made my spine so rigid that … the pain comes up to my neck into my shoulders. It literally ruined my entire spine movement." She changed her testimony to add, "But depending on my pain level, my abilities vary day to day." Gholipour testified she could only bend forward at the waist 35 to 40 degrees, not 90 degrees.

Gholipour testified she had gastrointestinal problems since the surgery in 2010 such as burping, acid reflux and pain. She stated she had constipation, abdominal pain, bloating, and irritable bowel symptoms daily. She also said she had left groin burning and numbness.

Additionally, Gholipour stated she had depression, panic disorder, and constant anxiety since she was injured at work in January 2007. She stated she had headaches, irritability, bursts of anger, and insomnia. She changed her deposition to add, "[a]lso forgetfulness. My memory is really bad now." When asked when she felt happy in the prior six to 12 months, she responded, "When I'm in church." She stated she was not really happy outside of church.

10

She stated her social life was limited and she usually went shopping, to doctor appointments, or outside for fresh air with help from her mother or friends from church. She stated she had thoughts of killing herself after surgery.

She stated she spent a lot of time in bed during the day because she did not sleep well and was drowsy and groggy from medications. She stated her mother helped her shower and dress in the afternoon. She would then eat something and go out for some fresh air. Then she would need to lay down and rest again.

Gholipour testified she had good and bad days. She stated, "Sometimes it gets worse for no reason. Sometimes it gets worse because I sat too long. Like today, I know I'm going to have more pain down the road because I'm sitting too long today. I'm moving too much today, so I know later I'm going to be in more pain."

F

After the deposition, Gholipour's male companion picked her up at the building entrance. He took her walker and put it in the trunk while Gholipour leaned against the rear of the vehicle and took small paces up to the passenger door where she opened it and slowly entered the vehicle. She entered the passenger door more hesitantly than she did on previous days at other locations.

When they arrived in the parking lot of a sporting goods store a few minutes later, however, Gholipour alighted from the passenger door and stood up without hesitation. In the store, she stood with her male companion and talked to an employee. She walked through the aisles browsing various items in the store. She did not have her walker and

11

did not have anything to assist her with standing. She did not appear to have difficulty with her balance over the 40 minutes she was in the store.

Gholipour stood in the doorway of the sporting goods store, holding the door open and primping her hair as she waited. She stood by the vehicle while her male companion placed something in the trunk. Then she entered the passenger door of the vehicle. They drove to another area in the same mall where they went into a patio store and then a barbeque outlet.

They then drove to another mall where they went to a restaurant. As they entered the mall, Gholipour and her companion walked arm in arm and Gholipour jiggled her body. They dined for about an hour. Her male companion stroked her hair before sitting down. Gholipour smiled, laughed, and appeared in a joyful mood. She consumed pizza and a beverage. She also kissed her companion. After lunch, they visited a shoe store, a department store, a bridal shop, and a book store.

Gholipour held hands with her companion as they shopped. In the department store, she tried on a purse. She also knelt down to look at men's suits and rose without difficulty. In the bookstore, Gholipour sat on the floor cross-legged while she looked at books. She then sat at a table immersed in conversation with her companion and gesturing with her hands for nearly an hour. Gholipour and her companion walked arm in arm. During an escalator ride, she pivoted toward him and rode the escalator backward for a period of time before turning around again.

After leaving the mall around 7:40 p.m., they went to another restaurant in a strip mall. They paused at some of the storefronts between the restaurant and the vehicle and

12

did some window shopping. Around 9:00 p.m., Gholipour embraced and hugged her male companion as she entered the passenger door of the vehicle. They then drove back to the apartment complex and she ascended the steps to the apartment with her arms crossed. She did not use the walker after she left the deposition.

G

The following morning, on July 14, 2012, Gholipour was seen bending over as she handled a potted plant on the stairway leading to the apartment. Her legs were straight and she bent over at a 90-degree angle. Thereafter, she carried a ceramic vase up and down the stairs without holding on to the railing.

Later that afternoon, her companion carried her walker from the car into the residence and several individuals were seen arriving with gifts. Thereafter, Gholipour and her companion drove with their guests to a nearby market. After exiting the market, Gholipour bent at the waist to place some items into a cooler.

The group went to a nearby park. Gholipour walked unassisted through the park with her companions. After exploring the park, the group returned to the vehicle and Gholipour retrieved the cooler, which she carried on her left shoulder. Gholipour sat on a carpet on the grass in a cross-legged position. She appeared to be in a playful or joyful mood. She walked around the park to a horse corral. She kneeled in the picnic area while handling an item. She consumed a beverage. She took and posed for photos.

After leaving the park, Gholipour drove the vehicle to a Starbucks before driving to another mall with a movie theater. Gholipour and her companions remained at the mall for approximately three hours. Gholipour and her companion returned to the

13

apartment around 12:45 a.m. Gholipour did not use the rolling walker at any time during the surveillance on July 14 or 15.

H

Plummer stated Gholipour's testimony about her limited social life was not accurate. The sub rosa video showed a very active social life. She laughed and smiled with her male companion throughout the day after the deposition. At the biker restaurant, she knew a lot of people. She hugged them and laughed and smiled with them. She appeared to go to a wedding and reception.

The videos showed Gholipour holding hands, hugging and appearing affectionate with her male companion. Although she testified she lived with her parents and sister, it appeared she actually lived with the male seen in the video. They would go out together and return to the apartment late in the evening together.

Similarly, her testimony about her various physical limitations was not accurate. Gholipour walked up the stairs of the two-story apartment building on more than one occasion without difficulty and without assistance. Although Gholipour left the deposition using a walker, she was not seen using the walker for the rest of the day. Indeed, she was quite active after she left the deposition. She sat and ate a long lunch, walked without difficulty as she shopped, and entered and exited the vehicle without difficulty. She smiled throughout the day while interacting with her male companion and appeared to have no physical difficulties. The following day she was seen bending 90 degrees or more when she worked with a potted plant and when she placed items into a cooler before going on a picnic with friends.

14

The videos had a significant impact on Gholipour's case. Three evaluating physicians changed their opinions about her level of permanent disability after reviewing the deposition and the videos. An orthopedic surgeon changed his whole person impairment (WPI) rating[4] from 28 percent impairment to 20 percent impairment. An internal medicine physician changed his WPI rating from 9 percent impairment to no injury. A psychiatrist changed his WPI rating from 15 percent impairment to no industrial psychological injury.

1

Richard Greenfield, M.D., an orthopedic surgeon, evaluated Gholipour in March 2008. She reported she was injured on January 5, 2007. She complained of lower back pain radiating into her left leg. Greenfield initially gave her a 13 percent WPI rating based upon her complaints of radiating pain. In 2010 she underwent spine surgery, in which a disc was removed and the fourth and fifth lumbar vertebral bodies (L4/5) were fused to resolve her pain.

When Greenfield evaluated Gholipour in October 2011, she reported using a walker to avoid falling. She stated her left leg balance was bad and she had fallen a few times at home. She reported her back and leg pain were worse. Greenfield did not see an objective cause for her leg pain on the MRI or on physical examination. He would have expected someone who complained of radiating pain, intermittent weakness and

---

4    A WPI rating reflects the degree to which the evaluator feels the individual's injury interferes with his or her activities of daily living.

instability of the leg for nearly five years to have some muscle atrophy.  Gholipour, had no atrophy whatsoever and muscle testing of the muscles innervated by the nerve root at L4/5 was normal.  However, after taking into consideration her subjective and objective complaints, her medical records, and the fact she had undergone a spinal fusion, he gave her a WPI rating of 28 percent impairment, the maximum rating based on loss of motion at L4/5 and reports of radiating pain.

Greenfield changed his opinion about her WPI in 2012 after he reviewed Gholipour's second deposition and the sub rosa videos.  Based on the deposition testimony, Greenfield would assume her surgery was a massive failure because she said she could not stand for 30 to 60 seconds without a walker, she could not walk 15 minutes without a walker, she could not climb stairs or ride in a car, and she spent most of her time in bed needing the help of her mother and church members.  However, the sub rosa videos showed someone far more functional.  She moved about freely without a walker, socialized, shopped, sat on the ground, and went up and down stairs.  What he saw on the videos indicated the spine surgery was successful.  He lowered her WPI rating to 20 percent because she did have some loss of motion in her spine as a result of the surgery.

2

Daniel Bressler, M.D. evaluated Gholipour from an internal medicine perspective regarding her claims regarding gastrointestinal problems and vaginal pain.  Based on his January 2010 evaluation, he initially gave Gholipour a WPI rating of 15 percent impairment for her complaints of chronic constipation and 9 percent for complaints of nonulcer dyspepsia.

16

Bressler reevaluated his opinion a year later after reviewing the American Medical Association guidelines for impairment. He lowered the rating for constipation from 15 to 0 percent because there were no objective anatomic findings of lower gastrointestinal problems. However, he retained the 9 percent impairment rating for nonulcer dyspepsia because the guidelines did not require objective findings for complaints related to the upper gastrointestinal tract. Bressler explained nonulcer dyspepsia does not have objective findings and the diagnosis depends upon the patient's credibility in describing symptoms.

Bressler lowered the WPI rating as to nonulcer dyspepsia after reviewing Gholipour's July 2012 deposition and the sub rosa videos. He found "a rather large gap between what had been reported to me" by Gholipour "and what she had reported in the deposition about her capacity and her lifestyle" as seen on the videos. Bressler's opinion about her credibility changed. He noted the discrepancy between her reports of constant gastrointestinal symptoms such as burping, constipation, abdominal pain and bloating, and what was shown in the videos of her going to Starbucks, eating at restaurants, and eating and drinking while socializing with no apparent signs of distress. Because the diagnosis of nonulcer dyspepsia is completely dependent on credibility, Bressler determined he could no longer support the diagnosis. He reassigned her WPI rating to 0 percent impairment.

3

Psychiatrist Dominick Addario, M.D., initially determined in 2009 Gholipour had no work-related psychological injury because, prior to the alleged injury she had been

17

treated for depression, had marital stressors and other stressors such as fire damage to her home. When Addario performed a second evaluation in December 2011, she appeared different. She was using a walker, which she said she needed all of the time. She was tearful and despondent. Her pain level appeared much higher than when he first saw her and it appeared her back surgery failed. She said her life had radically changed. She said she could not do anything because she could not get around, her marriage failed as a result of the injury, and she was having consequential financial problems. At this point, Addario felt the majority of her depression was now from the injury. Addario thought her statements about her physical limitations and her emotional and financial concerns were credible. He gave her a provisional rating of disability based on her psychological condition equating to 15 percent WPI. He apportioned 65 percent of her psychological problems to her work-related injury.

Addario's opinion about Gholipour's psychological disability changed after he reviewed her July 2012 deposition, the sub rosa videos, and supplemental reports from other physicians who had viewed the videos. Gholipour's deposition was consistent with her appearance in his examination when she told him she needed a walker all the time, she could not drive a car, and had severe unremitting pain, which caused her difficulties. However, on the sub rosa video, she appeared to be free from pain for hours at a time. She walked normally without a walker, wore high heeled shoes, and entered and exited vehicles without hesitation. She was social and responded to friends in a happy and affable way. "She was not the tearful, depressed person that I saw in my office." Addario opined she no longer had a psychiatric disability. She had a full and active life

with good social relationships. As a result, she had a 0 percent WPI psychiatric impairment. Addario diagnosed her with a malingering disorder based on an apparent conscious misrepresentation of her disabilities for secondary gain.

4

Plummer explained WPI ratings are based on American Medical Association guidelines for disabilities related to different body parts. The rating is used to determine the permanent disability awards for workers' compensation. The greater the impairment, the greater the award. The 9 percent rating provided by Bressler, the 15 percent rating provided by Addario, and the 28 percent rating provided by Greenfield, adjusted for occupation and age, combined for a 51 percent disability rating, totaling a little more than $64,000. When the physicians changed their ratings, the total 20 percent WPI rating would result in payments totaling approximately $23,000. Plummer stated he did not believe Gholipour's injury was work related and Sharp should not have paid her workers' compensation benefits.

J

Scynthia Syfrett, a senior workers' compensation specialist who has worked in the field for 25 years, is employed by Sharp's third-party administrator for workers' compensation insurance. She explained an injured worker may obtain temporary disability benefits paid at two-thirds of the employee's average weekly earnings up to a maximum amount of $1,074.64 per week. The injured worker is also entitled to medical coverage for injuries resulting from the original injury, including the cost of investigating

19

the need for such care.  Finally, the injured worker may obtain permanent disability benefits.

Syfrett worked on Gholipour's claim since it was filed in 2007.  Gholipour was paid $88,670.01 in temporary disability benefits.  She received medical treatment, medications, and a walker totaling $148,965.74.  Permanent disability was paid in the amount of $4,100.

During the course of the claim, Syfrett reviewed Gholipour's records from her medical doctors, both before and after the alleged injury.  She reviewed Gholipour's application for disability benefits.  Syfrett retained a private investigator in 2012 because there was an increase in Gholipour's symptoms and a lack of recovery.  Syfrett reviewed the supplemental reports from the medical examiners after they reviewed the sub rosa videos.  Based on all of this information, Syfrett did not believe Gholipour's injury was work related and did not believe Gholipour should have received workers' compensation benefits.

K

Gholipour testified in her own defense.  She testified she was working with a patient on Friday January 5, 2007, when she went into a utility room to retrieve an intravenous tray.  She stated she tripped over some boxes on the floor of the utility room. When she reached for a shelf to steady herself, the shelf shook and a 30-pound box of paper rolls fell on her.  She stated she grabbed the tray and ran out to treat the patient. After treating the patient, she returned to the utility room, straightened it up and went

20

about her day.  She stated her back did not hurt until the next morning.  There were no witnesses to the incident and she did not tell anyone about it.

The following morning, she said she awoke with severe pain in her lower back and left leg.  She said she self-treated over the weekend and returned to work on January 8, 2007.  However, she said she did not connect the incident in the supply closet and her pain.  She claims she collapsed behind her desk and other nurses took her to see a physician in the clinic who gave her lidocaine injections along the spine and prescribed pain medications.  Gholipour stated she did not mention the incident with the boxes because she was asked about the onset of pain.  Another Sharp physician noticed a disc problem on the MRI and started questioning her about what occurred before she felt the onset of pain.  When Gholipour mentioned the box incident to the second doctor, the doctor stopped her and said she could not treat Gholipour if it was a workers' compensation injury.  The second physician told Gholipour to report the incident to her supervisor.

Gholipour received pain management treatment with epidural injections and prescription medications until she had surgery in May 2010.  She stated she took medications every day after she underwent surgery, which allowed her to move around and be more comfortable.

She stated she lived with her parents in 2012 and occasionally spent the night at the apartment complex in Mission Viejo, but she would sleep on the couch.  She stated when she was asked whether she had relationships with other men after her divorce, she understood the question to inquire about whether she was having sexual relations.  She

21

indicated her response, "[n]o, just with friends and family" meant she was in a friendship, not a sexual relationship. She stated she began a sexual relationship with the man seen in the videos after they were married.

Gholipour testified she thought she was being asked in her deposition testimony about her physical abilities without the use of medications. She stated she was on medications when she was seen on the sub rosa videos walking up and down stairs without assistance. She said she took medication in the car and throughout the day after her deposition while they shopped. She similarly stated she took medication on the days she was seen at the picnic and at the restaurant.

She also stated she underwent abdominal surgery to remove five large tumors weighing 10 pounds. The People presented rebuttal evidence from her obstetrician/gynecologist stating he removed some fluid filled cysts and a golf-ball sized uterine fibroid, which weighed 10 to 40 grams.

## DISCUSSION

### I

*Multiple Convictions Appropriate*

Gholipour contends six of her perjury convictions (counts 5-10) should be consolidated into one conviction because they are based upon the same "material matter" since the statements were about interrelated aspects of her physical condition and were made in one deposition regarding her workers' compensation claim. Alternatively, she contends counts 5 and 6 and counts 7 and 10 are functionally equivalent because they required proof of the same fact. We disagree.

22

Section 118, subdivision (a) provides: "Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury."

"[A] charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once." (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 349.) Multiple counts of perjury under section 118, subdivision (a), may be based upon separate false statements made under oath. (*People v. Jiminez* (1992) 11 Cal.App.4th 1611, 1623-1624 (*Jiminez*), disapproved on another ground in *People v. Kobrin* (1995) 11 Cal.4th 416 (*Kobrin*).)

The jury determines the elements of the charge of perjury, "including materiality, i.e., whether the statement or testimony 'might have been used to affect [the proceeding in or for which it was made].' " (*Kobrin*, *supra,* 11 Cal.4th at p. 420.) For a matter to be material, it need not actually influence the proceedings (§ 123), rather the test is "whether the statement could probably have influenced the outcome of the proceedings." (*People v. Pierce* (1967) 66 Cal.2d 53, 61.)

23

The jury considered separate passages from Gholipour's second deposition about different aspects of her physical condition and convicted her of perjury as charged in counts 5 through 10. Count 5 related to her testimony about her ability to walk and the need to use a walker or a cane when she walked. Count 6 related to her testimony about her ability to stand, in which she stated she could not stand for more than one minute with a walker and could not stand at all without a walker most of the time. Count 7 related to her testimony about her ability to sit, in which she stated she could only sit for 10 to 15 minutes at a time. Count 8 related to her testimony about her lower and mid-back pain, which she described as constant. Count 9 related to her testimony about her limited ability to bend at the waist, in which she stated she could only bend forward 35 to 40 degrees. Count 10 related to her testimony about triggers or causes for changes in her condition. She stated her pain gets worse if she sits too long and she knew she would have more pain because she was sitting and moving too much on the day of her second deposition.[5]

The fact the statements for counts 5 through 10 were made during one deposition and involved Gholipour's physical condition does not preclude multiple convictions for perjury. Each count related to separate statements about separate physical symptoms. The evaluating physicians considered these various physical conditions for purposes of assigning her WPI rating. The testimony about each symptom was material to the

---

[5] The jury considered, but could not reach a verdict regarding count 11, which involved testimony about limitations on her social life and her ability to go out without help.

24

potential outcome in the workers' compensation case because the higher the level of impairment, the higher the compensation benefits available to a claimant. Multiple convictions for the multiple false statements regarding separate material matters are appropriate. (*Jiminez*, *supra*, 11 Cal.App.4th at p. 1624.)

We also do not agree counts 5 (ability to walk) and 6 (ability to stand) or counts 7 (ability to sit) and 10 (exacerbation of symptoms from prolonged sitting and moving) are functionally the same. These are not false statements about the same matters as Gholipour contends. They are distinct false statements about distinct material matters. Double jeopardy does not apply to separate offenses. (*People v. Bright* (1996) 12 Cal.4th 652, 660, overruled on other grounds in *People v. Seel* (2004) 34 Cal.4th 535.)

II

*Sufficient Evidence Supported Conviction for Count 4*

Count 4 charged Gholipour with perjury for her testimony she had not gone on dates or had relationships with men after her divorce. She was seen on sub rosa videos going out with a male companion, engaging in public displays of affection, and apparently living with this man. The jury disbelieved her trial testimony, in which she claimed she understood the questions to refer to sexual relations, and convicted her as charged in count 4.

Gholipour does not contend there was insufficient evidence to establish her deposition testimony was false. Instead, she contends there was insufficient evidence her statement about her relationship status was a material matter that could have influenced

25

the outcome of her workers' compensation proceeding because Addario did not base his psychiatric rating on her statement about her dating status.  We cannot agree.

When we review a challenge to the sufficiency of the evidence, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  …  A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

"The elements of perjury are:  'a "willful statement, under oath, of any material matter which the witness knows to be false." ' "  (*People v. Garcia* (2006) 39 Cal.4th 1070, 1091.)  "False testimony that affects the credibility of a witness is material and will support a perjury conviction."  (*People v. Rubio* (2004) 121 Cal.App.4th 927, 935; *People v. Macken* (1939) 32 Cal.App.2d 31, 39 ["[T]estimony which merely affects the credibility of a witness is material, for the reason that such evidence usually tends to strengthen the case of a party to an action or to weaken the defense of his adversary."].)

Addario based his psychiatric rating in 2011 on Gholipour's appearance as depressed and tearful after her surgery.  She told Addario she could not do anything

26

because she could not get around and this devastated her marriage. Addario diagnosed her with a major depressive disorder, in which patients are typically very low energy, lose interest in doing things socially, and are at the low end of functioning emotionally.

The problems she described in her 2012 deposition testimony, which included her statement about her lack of dating relationships, were consistent with what she told him during his 2011 evaluation. However, the sub rosa videos were inconsistent with these descriptions. She was seen walking normally in high heels and apparently free from pain for reasonably long periods of time. She was social. "She responded and related to friends in a happy, affable way," including a male companion. She responded to this man in an affectionate way. He concluded, "it didn't look like a person who was depressed." Rather, "her behavior as I observed it and the difference in her deposition, in my evaluation … would be consistent with a malingering disorder, which is a conscious misrepresentation of her difficulties" for secondary gain.

Addario noted both Greenfield and Bressler prepared reports after reviewing the sub rosa videos and stated they found her physical complaints not credible. As a result of all of this information, Addario changed his opinion and concluded Gholipour had no psychiatric disability. "[S]he had a full and active life" and "good social relationships."

Addario testified a patient's credibility is very important to his assessment because 30 percent of his impression is based on subjective complaints. Her lack of credibility was significant not only to Addario, but to the other physicians as well. As a result, we conclude there was sufficient evidence to support the jury's determination Gholipour's

27

false testimony about her relationship status was material and supported her conviction for count 4.

*Lay Witness Opinion Testimony Appropriate and Not Prejudicial*

Gholipour next contends the trial court erred in allowing Plummer and Syfrett to testify regarding their opinions about whether Gholipour had a work-related injury and whether Sharp should have paid her workers' compensation benefits. She contends the admission of this lay opinion testimony was a prejudicial violation of her constitutional due process rights. Again, we disagree.

Under Evidence Code section 800, " '[a] lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1254.) " ' "The true rule [as to the admissibility of lay witness opinion testimony] is simple and, so far as this state is concerned, well established: to permit, or to refuse to permit, such questions is a matter resting largely in the discretion of the trial court, which discretion will not here be reviewed unless it is made plain that the court's ruling in admitting the evidence has worked an injury. Generally speaking, the admission of the answer to such a question cannot work an injury where a fair latitude upon cross-examination is allowed, for under such cross-examination the facts are certain to be adduced. It will be found frequently that an appellate tribunal upholds the rulings of the trial court in sustaining an objection to such questions, but the cases are far less numerous where it has felt compelled to

28

reverse the inferior tribunal for permitting them." ' " (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112.)

"We review claims regarding a trial court's ruling on admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

In this case, Plummer and Syfrett testified regarding the workers' compensation claim process based upon their years of experience in handling such claims. They discussed their actions in processing and defending the claim brought by Gholipour as well as the documents and materials they reviewed related to their work on her claim. At the end of their testimony, they each responded to two questions stating they did not believe Gholipour's injury was work related and, in hindsight, Sharp should not have paid her workers' compensation claim.

The totality of their testimony was relevant to the issue of whether Gholipour made fraudulent material statements for purposes of obtaining workers' compensation benefits. Their concluding opinions based upon their perception of the evidence reviewed in the course of their work was helpful to understanding their testimony and was not unduly prejudicial. Gholipour's attorney cross-examined Syfrett about her lack of investigation into the circumstances surrounding the incident in the supply room. A jury is not compelled to accept a witness's opinion as to an ultimate fact. Even an expert witness " 'remains only a witness, to whose opinion the trier of fact need give no more

29

acceptance than is compelled by the reasons upon which it is based.' " (*People v. Wilcox* (1986) 177 Cal.App.3d 715, 717, quoting *People v. Davaney* (1970) 7 Cal.App.3d 736, 749.) We conclude the court did not abuse its discretion in allowing this testimony.

Even were we to conclude there was error, reversal is not required because any error was harmless under both the federal and state standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 & *People v. Watson* (1956) 46 Cal.2d 818, 836-837.) There was more than ample evidence to support Gholipour's convictions for perjury and for making false and fraudulent statements in 2012 for purposes of obtaining workers' compensation. There is no reasonable chance a jury would have reached a different verdict if these lay opinions about whether she ever had a work-related injury were disallowed.

IV

*Restitution Appeal*

A

The trial court considered the issue of restitution in a separate proceeding after trial. On behalf of Sharp, the People sought restitution for all medical costs Sharp incurred from the time Gholipour's health coverage expired after her initial claim through the conclusion of the case. It also sought all costs related to reviewing the reasonableness and necessity of the care provided, temporary disability paid to Gholipour, and the investigative and attorney fees incurred for Sharp to defend the claim. The People acknowledged Gholipour was not charged with making a fraudulent workers' compensation claim from the inception of her claim based on a statute of limitations

30

problem, but argued the trial evidence supported full restitution because the entirety of her claim was fraudulent.

Gholipour contended she should only be responsible for restitution for the crimes for which she was convicted by a jury based upon misrepresentations in 2012. She contended she should not be responsible for medical costs prior to that time because she was not convicted of misrepresenting the cause of her injury.

After considering the arguments of counsel, the court made a factual finding Gholipour's entire workers' compensation claim was predicated on the false statement she was injured at work. Based upon the evidence presented at trial, the court concluded the initial claim was "invalid and false and fraudulent and void from the beginning." As a result, the court ordered restitution in the amount of $309,101.05 for temporary disability benefits, medical costs, attorney fees and investigator fees. We consolidated Gholipour's appeal from the restitution order (D068234) with the appeal from the judgment (D067177).

B

"The California Constitution gives crime victims a right to restitution and, consequently, requires a court to order a convicted wrongdoer to pay restitution in every case in which a crime victim suffers a loss. (Cal. Const., art. I, § 28, subd. (b)(13)(B).)" (*People v. Sy* (2014) 223 Cal.App.4th 44, 62 (*Sy*).) To implement this constitutional right to restitution, section 1202.4, subdivision (a)(1), provides, "[i]t is the intent of the Legislature that a victim of crime who incurs an economic loss *as a result of the commission of a crime* shall receive restitution directly from a defendant *convicted of that*

31

*crime*." (Italics added.) Generally, "in every case in which a victim has suffered economic loss *as a result of the defendant's conduct*, the court shall require that the defendant make restitution to the victim … in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f), italics added.)

"The restitution amount 'shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct.' (§ 1202.4, subd. (f)(3).) 'The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution.' (§ 1202.4, subd. (f)(1).) [¶] . . . [¶]

" ' "The standard of review of a restitution order is abuse of discretion. 'A victim's restitution right is to be broadly and liberally construed.' [Citation.] ' "Where there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' [Citations.]" [Citation.] However, a restitution order "resting upon a ' "demonstrable error of law" ' constitutes an abuse of the court's discretion. [Citation.]" [Citation.] … [¶] ' "[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole." ' " ' " (*Sy*, *supra*, 223 Cal.App.4th at p. 63.)

C

Gholipour first contends the court violated her federal constitutional rights as described in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) because she was

32

entitled to a jury trial on the issue of whether her entire workers' compensation claim was fraudulent. A court is not precluded from making factual findings as part of a restitution hearing.

In *Apprendi*, the United States Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.) "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (*Blakely v. Washington* (2004) 542 U.S. 296, 303 (*Blakely*), italics omitted.) "[T]he rule of *Apprendi* applies to the imposition of criminal fines." (*Southern Union Co. v. United States* (2012) 567 U.S. ___, ___ [132 S.Ct. 2344, 2357, 183 L.Ed.2d 318] (*Southern Union*).) However, "nothing in [the common law and constitutional history] suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." (*Apprendi*, *supra*, at p. 481.)

There is no statutory maximum for restitution to a direct victim under section 1202.4. California courts have held " 'neither *Southern Union, Apprendi* nor *Blakely* have any application to direct victim restitution, because direct victim restitution is not a criminal penalty. … [D]irect victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased "punishment." ' " (*People v. Wasbotten* (2014) 225 Cal.App.4th 306, 309 (*Wasbotten*),

33

quoting *People v. Pangan* (2013) 213 Cal.App.4th 574, 585-586.) The restitution ordered in this case was direct compensation to the victim, not a criminal fine as in *Southern Union*. (*Wasbotten*, *supra*, at p. 309.) Restitution paid directly to victims is separate and apart from restitution fines. (*People v. Villalobos* (2012) 54 Cal.4th 177, 180-181.)

We also find no merit to Gholipour's contention the California Constitution required a jury trial on the issue of victim restitution because it is a substitute for a civil remedy. Although "the restitution order and the civil jury award produce the same result (an enforceable judgment against the defendant [citation], they are a different means to that end, one based in the civil law, with its protections and requirements, and the other in criminal law, with its own protections and requirements. The restitution hearing … is a criminal sentencing hearing, not a civil trial." (*People v. Smith* (2011) 198 Cal.App.4th 415, 434.) "As a sentencing order, a restitution order for … damages does not give rise to a jury trial right. [¶] 'In determining the propriety and amount of restitution, the preponderance of the evidence standard satisfies due process. [Citation.] The defendant is not entitled to a jury trial [citation] and "the requisite hearing [need not] approximate the formality of a civil trial." ' " (*Id.* at p. 433.)[6]

### D

Gholipour's next contention raises the more difficult question of whether the factual finding made by the court permitted the court to award restitution under section

---

6      Given our conclusion, we need not reach Gholipour's ineffective assistance of counsel claim.

1202.4 for economic damages incurred *before* Gholipour made the fraudulent statements in 2012 for which she was convicted. We conclude it did not permit such an award.

"Courts have interpreted section 1202.4 as limiting restitution awards to those losses arising out of the criminal activity that formed the basis of the conviction." (*People v. Woods* (2008) 161 Cal.App.4th 1045, 1049 (*Woods*), citing *People v. Lai* (2006) 138 Cal.App.4th 1227, 1247 (*Lai*).) In other words, "when a court imposes a prison sentence following trial, section 1202.4 limits the scope of victim restitution to losses caused by the criminal conduct for which the defendant sustained the conviction." (*Woods*, *supra*, at p. 1050.)

This limitation does not apply to discretionary restitution orders in the context of grants of probation under section 1203.1. (*Woods*, *supra*, 161 Cal.App.4th. at p. 1050.) " 'California courts have long interpreted the trial court's discretion to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction. Under certain circumstances, restitution has been found proper where the loss was caused by related conduct not resulting in a conviction [citation], by conduct underlying dismissed and uncharged counts [citation], and by conduct resulting in an acquittal.' " (*Ibid*., quoting *People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.)

A split sentence to time in county jail followed by mandatory supervision pursuant to section 1170, subdivision (h), is equivalent to a prison sentence subject to the mandatory restitution requirements of section 1202.4 rather than discretionary restitution ordered as a condition of probation under section 1203.1. (*People v. Rahbari* (2014) 232

35

Cal.App.4th 185, 190, 196.) Therefore, the limitation of section 1202.4 applies to this case.

In *People v. Rubics* (2006) 136 Cal.App.4th 452 (*Rubics*) we interpreted section 1202.4 as requiring a restitution award to be made for "a loss incurred 'as a result of the commission of a crime' for which [the defendant] was convicted." (*Rubics*, *supra*, at p. 457.) In that case, however, where the defendant pleaded guilty to one count of felony hit-and-run under Vehicle Code section 20001 resulting in a death, we looked to the elements of the crime and concluded funeral expenses for the deceased victim were recoverable as restitution. We noted death or injury was a necessary element of the crime even though the focus of the crime was on leaving the accident. "[A]lthough a primary focus of [Vehicle Code] section 20001 may be the act of leaving the scene [of an accident], a conviction also acknowledges the fleeing driver's responsibility for the damages he or she has caused by being involved in the accident itself." (*Rubics*, at p. 459.) Therefore, we concluded it was proper for the court to order the defendant to pay the victim's funeral expenses "because the 'victim … suffered economic loss as a result of the defendant's conduct.' " (*Id*. at p. 461.)[7]

In *Lai, supra,* 138 Cal.App.4th 1227, the defendants were convicted of conspiracy to commit welfare fraud, welfare fraud and perjury by false application for aid from 1985

---

[7] The Supreme Court granted review in a case that distinguished *Rubics* and held to the contrary because there was no determination of the defendant's culpability for the accident. (*People v. Martinez* (2014) 226 Cal.App.4th 1156, review granted Sept. 10, 2014, S219970.) The case pending before the Supreme Court presents the issue of whether a defendant convicted of hit-and-run and sentenced to prison should be required to pay restitution for injuries suffered by the victims in a collision.

to 2000.  (*Id*. at pp. 1234, 1246.)  The trial court ordered restitution not only for the fraudulently obtained aid during the charged period, but also for aid the defendants fraudulently obtained over several years "*before the crimes of which [the defendants] were convicted.*"  (*Id.* at p. 1246.)  The appellate court held "section 1202.4 contains no provision that permits an award of restitution for losses caused by uncharged crimes when the defendant is sentenced to state prison."  (*Id*. at p. 1248.)  Instead, the court concluded "section 1202.4 limits restitution to losses caused by the criminal conduct for which the defendant was convicted."  (*Id*. at p. 1249.)  On remand, the trial court was directed to delete the portion of the restitution award attributable to crimes before the charged period.  (*Id*. at p. 1259.)

Applying the *Lai* analysis, the court in *Woods, supra,*161 Cal.App.4th 1045 concluded a defendant who was convicted as an accessory after the fact could not be held responsible for restitution arising from the loss resulting from a murder because "his criminal conduct did not cause the loss for which compensation was sought."  (*Woods*, at p. 1052.)

The People contend *Lai*, *supra*, 138 Cal.App.4th 1227 and *Woods*, *supra*, 161 Cal.App.4th 1045 are distinguishable and inapposite because the trial court here made a finding of fact Gholipour's initial claim for workers' compensation was false and proximately caused Sharp to incur significant financial losses prior to 2012.  We agree there was substantial evidence to support the court's finding.  However, we are not persuaded this finding is helpful.

37

Gholipour was convicted of three counts (counts 1-3) of making false and fraudulent statements misrepresenting her condition at her deposition in July 2012 and one count of making a false and fraudulent statement, also in July 2012, to misrepresent her condition to a physician (count 13) for purposes of obtaining workers' compensation in violation of Insurance Code section 1871.4, subdivision (a). The trial court's finding of fact that she made fraudulent statements in 2007 did not result in a *conviction*. Thus, there is no basis for a restitution award under section 1202.4 for fraudulent conduct for which she was not convicted.

Insurance Code section 1871.5 also provides, "[a]ny person *convicted of* workers' compensation fraud pursuant to Section 1871.4 … [citation] shall be ineligible to receive or retain any compensation … [citation], where that compensation was owed or received as a result of a violation of Section 1871.4 … [citation] for which the recipient of the compensation *was convicted*." (Italics added.) Since Gholipour was not convicted for making false or fraudulent representations in violation of Insurance Code section 1871.4 prior to July 2012, Insurance Code section 1871.5 does not support a restitution award for compensation owed or received prior to that date. The portion of the restitution award attributable to conduct prior to July 2012 must be stricken.

## DISPOSITION

We reverse the portion of the restitution order awarding restitution for conduct prior to July 2012. On remand, the trial court is directed to conduct further restitution proceedings consistent with this opinion to revise the restitution award to include only

38

those damages attributable to the crimes for which Gholipour was convicted.  We affirm

the judgment in all other respects.


McCONNELL, P. J.

WE CONCUR:


NARES, J.


O'ROURKE, J.